**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

M.L., E.W., S.W., and K.Y. residing at
UNITED STATES PENITENTIARY, LEE,
Hickory Flats Road
Pennington Gap, VA 24277,

individually, and on behalf of all others
similarly situated,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA,

and

MERRICK GARLAND
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530,

and

COLETTE PETERS
Director
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534,

and

CHRISTOPHER GOMEZ
Regional Director
Mid-Atlantic Region
302 Sentinel Drive
Annapolis Junction, MD 20701,

and

Case No. 1:24-cv-00017-JPJ-PMS

Magistrate Judge Pamela Meade Sargent

J.C. STREEVAL
Former Warden
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

JOHN GILLEY
Warden
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. KAREEM WASIM, PsyD
Chief Psychologist
Psychology Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. BIANCA BULLOCK, PsyD
Psychology Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. LAUREN BAILEY, PsyD, DAPC
Psychology Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

2

and

DR. TIMOTHY YORK, MAT
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

NANCY SMITH, FNP
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

KAELA BAKER
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

M. SLOAN
Psychology Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

RICKY D. BRADBURN
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

3

JAMIE D. GILBERT
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

OFFICER GIBSON
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

AARON THOMPSON
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

LIEUTENANT SMITH
Lieutenant Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

LEON CAUDILL, R.N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277,

and

4

UNKNOWN DEFENDANTS 1–50

*Defendants*.

## SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR INDIVIDUAL DAMAGES

Plaintiffs M.L., E.W., S.W., and K.Y. (collectively, "the named Plaintiffs"), for themselves individually and on behalf of a class of additional unnamed Plaintiffs similarly situated, submit this Second Amended Complaint seeking injunctive relief against Defendants Merrick Garland, Colette Peters, Christopher Gomez and John Gilley.  Plaintiffs further seek individual damages against Defendants United States of America, John Gilley, J.C. Streeval, Dr. Kareem Wasim, Dr. Bianca Bullock, Dr. Lauren Bailey, Dr. Timothy York, Nancy Smith, and Kaela Baker, M. Sloan, Ricky D. Bradburn, Jamie D. Gilbert, Officer Gibson, Aaron Thompson, Lieutenant Smith, Leon Caudill, and Unknown Defendants 1–50 (collectively "Defendants"; without the United States, "Individual Defendants").   The named Plaintiffs hereby allege, based on their personal knowledge, information, and belief, as follows.

## NATURE OF THE CASE

1. "We don't do that psych shit here." – Defendant Dr. K. Wasim, Chief Psychologist ("Defendant Wasim") at United States Penitentiary Lee ("USP Lee").

2. In various iterations, guards, and staff at USP Lee frequently recite this mantra to residents at USP Lee seeking mental health care.  The deliberate indifference of the staff at USP Lee to the health of its residents is not reflected in words alone—it is institutional culture to neglect the mental health needs of its residents.

3. The Federal Bureau of Prisons ("BOP") generally classifies the following diagnoses as "serious mental illnesses: schizophrenia spectrum and other psychotic disorders,

5

bipolar and related disorders, and major depressive disorder."[1]   In addition, the following diagnoses are often classified as "serious mental illnesses, especially if the condition is sufficiently severe, persistent, and disabling: anxiety disorders, obsessive-compulsive and related disorders, trauma and stressor-related disorders, intellectual disabilities and autism spectrum disorders, major neurocognitive disorders, and personality disorders."[2]

4.      A significant number of incarcerated persons suffer from such serious mental health conditions and are incarcerated, at least in part, because of their unmet health needs, including untreated mental illnesses and substance use disorders that disproportionately intersect with other physical health conditions.[3]   Proper medical and mental health care while in prison is critical to ensuring the rehabilitation of individuals and reducing the likelihood of recidivism.   Moreover, adequate mental health treatment of incarcerated individuals not only helps to ensure safety among the prison population, but also contributes to the safety of the general public as incarcerated individuals are released and re-enter society.

5.      Health care, including treatment for mental health, is one of the primary responsibilities the BOP assumes for the approximately 155,000[4] people in federal custody.[5] Individuals in the BOP's facilities completely rely on BOP staff and medical professionals for their

---

[1] *Treatment and Care of Inmates With Mental Illness*, Fed. Bureau of Prisons at 1–2 (May 1, 2014), https://www.bop.gov/policy/progstat/5310_16.pdf.

[2] *Id.* (noting that residents with illnesses not listed may also be classified as "seriously" mentally ill if their symptoms result in significant functional impairment).

[3] *Incarceration and Health:  A Family Medicine Perspective (Position Paper)*, Am. Acad. of Family Physicians, https://www.aafp.org/about/policies/all/incarceration.html#:~:text=Compared%20to%20 the%20general%20population,hepatitis%20C18%20and%20tuberculosis (last visited Mar. 23, 2024); Alexis Jones & Wendy Sawyer, *Arrest, Release, Repeat:  How police and jails are misused to respond to social problems*, Prison Pol'y Initiative (Aug. 2019), https://www.prisonpolicy.org/reports/repeatarrests.html (last visited Mar. 23, 2024).

[4] *Statistics*, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/population_statistics.jsp;#:~:text=155%2C471%20Total%20Federal%20Inmat es,Last%20Updated%20February%208%2C%202024 (last visited Mar. 23, 2024).

[5] *See Treatment and Care of Inmates with Mental Illness*, Fed. Bureau of Prisons (May 1, 2014), https://www.bop.gov/policy/progstat/5310_16.pdf; *Psychology Services Manual*, Fed. Bureau of Prisons (Aug. 25, 2016), https://www.bop.gov/policy/progstat/5310_017.pdf [hereinafter Program Statement 5310.17].

healthcare needs, including prescriptions and access to their medications, scheduling necessary medical appointments and referrals to outside providers, and appropriate treatments and examinations by medical personnel.  Incarcerated individuals are therefore completely dependent on Defendants, BOP guards, and staff to receive necessary health care.

6.    The BOP and its staff are deliberately indifferent to their obligations, and USP Lee's provision of health care, particularly mental health care, is systemically dysfunctional and virtually nonexistent for its residents.  As a result, individuals with serious mental health needs are unable to access proper treatment.

7.    This is an action brought by the named Plaintiffs on behalf of themselves and other similarly situated class members, individuals who either currently or will in the future reside at USP Lee, located in Pennington Gap, Virginia.  This action seeks class-wide declaratory and injunctive relief in an effort to remedy the deliberate indifference and failure of staff at USP Lee to provide its residents with appropriate mental health care sufficient to satisfy the minimum standards under the Eighth Amendment of the United States Constitution.

8.    The named Plaintiffs also seek individual damages for injuries they sustained as a result of Defendants' deliberate indifference to their serious medical needs,[6] and for the negligent and wrongful acts and omissions of employees and agents of Defendant United States of America.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171, and 28 U.S.C. § 1346(b) because it arises under the Constitution and laws of the United States and involves claims alleging negligent and other wrongful acts by employees of the federal

---

[6] The named Plaintiffs may seek additional relief, including without limitation, individual damages recoverable under 28 U.S.C. § 171 and 28 U.S.C. § 1346(b), other state and federal statutes, and at common law, and hereby reserve their rights to pursue such claims.

government.  This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because one or more of Defendants reside in this judicial district, and all or a substantial amount of the events, acts, or omissions giving rise to claims for class relief occurred in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

### A.    Plaintiffs

11.    Plaintiff M.L. ("M.L."), a 26-year-old African American man from Washington, DC, has been incarcerated at USP Lee since on or about April 5, 2023.  M.L. has suffered from severe mental health issues since his first suicide attempt at the age of 7.  He has received a multitude of diagnoses throughout his life both in and out of federal custody, including schizophrenia, bipolar disorder, major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, post-traumatic stress disorder ("PTSD"), borderline personality disorder, antisocial personality disorder, opioid use disorder, cannabis use disorder, phencyclidine use disorder, intellectual disability, and attention deficit disorder ("ADD") or attention deficit/hyperactivity disorder ("ADHD").  M.L. has received mental health treatment and medication management to help reduce the symptoms of these diagnoses both in and outside federal custody for much of his life.  Since being incarcerated within the BOP, M.L. has received over 60 Suicide Risk Assessments.[7]

---

[7] "A Suicide Risk Assessment will be completed when:  staff refer an inmate to Psychology Services because the inmate may be at risk for suicide (e.g., the inmate refuses his or her property, talks about ending his or her life), an inmate's written or verbal behavior is suggestive of suicide, an inmate exhibits behavior suggestive of self-harm, or any other condition is present that would lead the clinician to believe an assessment is warranted." *Suicide Prevention Program*, Fed. Bureau of Prisons at 10 (Apr. 5, 2007), https://www.bop.gov/policy/progstat/5324_008.pdf.

12.     Plaintiff E.W. ("E.W."), a 50-year-old African American man from Arkansas, has been incarcerated at USP Lee since February 8, 2023.  E.W. has suffered from anxiety, delusional periods of psychosis, and PTSD for much of his adult life.  He has been treated for such illnesses with various treatment modalities, including medication management both while in and outside federal custody.

13.     Plaintiff S.W. ("S.W.") is a 44-year-old African American man from Michigan who has been incarcerated at USP Lee since August 2022.  S.W. suffers from unspecified anxiety disorder, depression, and has experienced multiple panic attacks following a suicide attempt in January 2022.  S.W. received mental health treatment and medication management at USP Atwater from February 2022 until his arrival at USP Lee.

14.     Plaintiff K.Y. ("K.Y.") is a 40-year-old African American man from Alabama who has been incarcerated at USP Lee since April 2023.  Since 2004, K.Y. has been diagnosed with several mental illnesses, including schizophrenia, unspecified mood disorder, anxiety and manic depression.  He has been treated for such illnesses both in and outside federal custody.  Such treatments have included both medication management and therapeutic interventions.  When he complained about the lack of mental health care he received at USP Lee, he suffered violent and severe retaliation.

**B.     Defendants**

15.     Defendant United States of America ("United States") created and oversees the BOP, a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities.  The United States employs all BOP correctional officers, guards, and staff named

9

as Defendants in this action.  At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

16.    Defendant Merrick Garland ("Defendant Garland") is the Attorney General of the United States.  The Attorney General is the head of the United States Department of Justice, which includes the Bureau of Prisons.  Defendant Garland is being sued in his official capacity.

17.    Defendant Colette Peters ("Defendant Peters") is the Director of the Bureau of Prisons.  The Director is responsible for the operation of 122 BOP facilities, including USP Lee, six regional offices, two staff training centers, and 22 residential re-entry management field offices.  She is also responsible for the oversight and management of approximately 35,000 staff and 160,000 incarcerated individuals.  Defendant Peters is being sued in her official capacity.

18.    Defendant Christopher Gomez ("Defendant Gomez") is the Regional Director of the Mid-Atlantic Region for the BOP, which includes USP Lee.  The Regional Director oversees the operation of 21 BOP facilities, including USP Lee.  He is responsible for the oversight and the management of more than 6,200 employees and the custody and care of approximately 27,000 incarcerated individuals.  Defendant Gomez is being sued in his official capacity.

19.    Defendant J.C. Streeval ("Defendant Streeval") is the former Warden of USP Lee, and he served as Warden during part of the time the named Plaintiffs were incarcerated at USP Lee.  He was responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents.  He is sued here in his individual capacity.  Upon information and belief, Defendant Streeval resides in Tennessee and worked in the Commonwealth of Virginia.

20.    Defendant John Gilley ("Defendant Gilley") is the current Warden of USP Lee, and he served as Warden during part of the time the named Plaintiffs were incarcerated at USP Lee.

10

He is responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents. He is sued here in both his official and his individual capacities. Upon information and belief, Defendant Gilley resides and works in the Commonwealth of Virginia.

21. Defendant Kareem Wasim ("Defendant Wasim") is the Chief Psychologist in Psychology Services at USP Lee. Defendant Wasim conducts clinical and forensic psychological evaluations with individuals incarcerated at USP Lee. He is being sued in his official and individual capacities. Upon information and belief, Defendant Wasim resides and works in the Commonwealth of Virginia.

22. Defendant Dr. Bianca Bullock ("Defendant Bullock") is a psychologist within Psychology Services at USP Lee. She is being sued in her individual capacity. Upon information and belief, Defendant Bullock resides and works in the Commonwealth of Virginia.

23. Defendant Dr. Lauren Bailey ("Defendant Bailey") is a psychologist within Psychology Services at USP Lee. She is being sued in her individual capacity. Upon information and belief, Defendant Bailey resides and works in the Commonwealth of Virginia.

24. Defendant Dr. Timothy York ("Defendant York") is a medical doctor within Health Services at USP Lee. He is being sued in his individual capacity. Upon information and belief, Defendant York resides and works in the Commonwealth of Virginia.

25. Defendant Nancy Smith is a nurse within Health Services at USP Lee. She is being sued in her individual capacity. Upon information and belief, Defendant Nancy Smith resides and works in the Commonwealth of Virginia.

11

26.     Defendant Kaela Baker ("Defendant Nurse Baker") is a nurse within Health Services at USP Lee.  She is being sued in her individual capacity.  Upon information and belief, Defendant Nurse Baker resides and works in the Commonwealth of Virginia.

27.     Defendant M. Sloan ("Defendant Sloan")  is a psychology assistant within Psychology Services at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Sloan resides and works in the Commonwealth of Virginia.

28.     Defendant Ricky D. Bradburn ("Defendant Bradburn")  is a Correctional Officer at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Bradburn resides and works in the Commonwealth of Virginia.

29.     Defendant Jamie D. Gilbert ("Defendant Gilbert")  is a Correctional Officer at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Gilbert resides and works in the Commonwealth of Virginia.

30.     Defendant Officer Gibson ("Defendant Gibson")  is a Correctional Officer at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Gibson resides and works in the Commonwealth of Virginia.

31.     Defendant Aaron Thompson ("Defendant Thompson")  is a Correctional Officer at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Gibson resides and works in the Commonwealth of Virginia.

32.     Defendant Lieutenant Smith ("Defendant Lt. Smith")  is a Lieutenant Officer at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Lt. Smith resides and works in the Commonwealth of Virginia.

33.     Defendant Leon Caudill  is a nurse within Health Services at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Caudill resides and works in the Commonwealth of Virginia.

34.     Unknown Defendants 1–50 are USP Lee employees who worked at USP Lee at the time of the named Plaintiffs' injuries.  They are each sued in their individual capacity.  Upon information and belief, Unknown Defendants 1–50 work in the Commonwealth of Virginia.

## FACTUAL BACKGROUND

### A.     USP Lee and Its Mental Health Services

35.     USP Lee is a federal penitentiary within the BOP located in Pennington Gap, Virginia.

USP Lee is a high-security facility that houses approximately 1,400 adult males.[8]  USP Lee has twelve housing units located in three buildings.[9]  Each housing unit can house 128 residents.[10]

36.     The Psychology Services Department at USP Lee is responsible for providing psychological services which include the "assessment and treatment of mental disorders as well as evidence-based programs to reduce the risk of recidivism and institution misconduct."[11]  "Each Warden is responsible for the appropriate management of mentally ill inmates in his/her institution."[12]

37.     The BOP has created a Care Level Classification System for Medical and Mental Health Conditions or Disabilities for the purported purpose of assigning each resident to an

---

[8] Charles Thornton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council at 4 (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%2 0FINAL%20with%20BOP%20response%209-6-19.pdf.
[9] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/ (last visited Mar. 23, 2024).
[10] *Id.*
[11] Program Statement 5310.17 at 1.
[12] Program Statement 5310.016 at 4

13

institution that can best meet each individual's care needs.[13]  There are four care levels in the classification system, and an assigned care level is determined by the individual's medical, and/or mental health needs based on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as the resident's functional capabilities.[14]

38.     Care Levels 1 and 2 are provisional care levels which are assigned by the Designation and Sentence Computation Center ("DSCC") for a newly sentenced resident meeting Care Level 1 or 2 criteria, primarily based on information contained in the resident's pre-sentence investigation report.  Upon a resident's transfer to a new BOP facility, and after an initial or provisional evaluation is performed, a resident's Care Level can be redesignated to a Care Level 3 or 4 if the resident meets the criteria.[15]

39.     Residents assigned a Care Level 1 may have limited medical needs that can be managed by clinical evaluations every six to twelve months, while residents assigned to Care Level 2 are required to have enhanced medical resources and clinical evaluations anywhere from monthly to every six months.[16]

40.     Residents assigned Care Levels 3 and 4 typically suffer from complex or chronic physical and mental health conditions and require more frequent clinical contacts or enhanced medical services that are only available at a BOP Medical Referral Center in order to maintain stability over their conditions.[17]

---

[13] *Care Level Classification for Medical and Mental Health Conditions and Disabilities*, Fed. Bureau of Prisons at 1 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf [hereinafter, Care Level Classification Guide].
[14] *Id.* at 3.
[15] *Id.*
[16] *Id.* at 2.
[17] *Id.* at 3.

41.     BOP Program Statement 6360.01 ("P.S. 6360") dictates the distribution of medication within the BOP.[18]

42.     During a transfer and intake at a new facility, a resident retains the medication that was prescribed by another BOP facility so long as it is not "otherwise restricted by policy (e.g., controlled substance)."[19]

43.     When a resident receives medication through the pill line at his facility, the staff member distributing the medication is required to identify the resident using two forms of identification before administering the dose.[20]  Forms of acceptable identification include a photo ID, date of birth, registration number, or name.[21]

44.     Once appropriately identified, the staff member provides the resident with the medication, ensures they swallow it, and documents the administration of the medication in the Medication Administration Record ("MAR").[22]  If a resident refuses to accept the medication or is deemed a "no-show," that information is required to be reflected in the MAR.[23]

45.     When a facility is on lockdown or when a resident is in the Special Housing Unit ("SHU"), residents are unable to receive medications through the facility's pill line. In these circumstances, except when a resident is permitted to self-carry their medication, residents rely on BOP staff to deliver medications to them through their cell doors.

46.     USP Lee has one SHU, the purported purpose of which is to (1) house residents in disciplinary segregation as a result of a formal disciplinary finding; (2) house residents in

---

[18] *See generally Pharmacy Services*, Fed. Bureau of Prisons (Jan. 15, 2005), https://www.bop.gov/policy/progstat/6360_001.pdf [hereinafter Program Statement 6360.01].
[19] *Id.* at 22.
[20] *Id.* at 18.
[21] *Id.*
[22] *Id.* at 19.
[23] *Id.*

administrative detention pending a transfer or investigation of a disciplinary infraction; and (3) house residents in protective custody.[24]

47.    The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  Guards and staff at USP Lee instead use that room to abuse and torture residents without justification.  The medical staff tasked with providing adequate care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that take place, and the severe injuries to residents that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring obvious or reported wounds, and/or by falsifying medical reports.

48.    Although the SHU is generally reserved for individuals who either pose a threat to other residents or staff, or are at risk of harm, Defendants confine individuals in the SHU for no legitimate reason.  Residents are remanded to the SHU, which is almost always fully occupied, so that prison staff can take advantage of seemingly vulnerable residents, and/or as retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or their requests for mental health care.

**B.  BOP Guidelines on Use of Force**

49.    The injuries sustained by M.L, E.W., and K.Y., described more fully below, arose, in part, from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

50.    The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation

---

[24] *Special Housing Units*, Fed. Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf [hereinafter Program Statement 5270.11].

have failed.[25]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage, and to ensure institutional security and good order.[26]

51.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:   (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[27]

52.     Under no circumstances may physical restraints be employed to punish residents.[28]

53.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[29]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[30]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[31]

54.     Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[32]  In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant

---

[25] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[26] *Id.* ¶ 1.
[27] *Id.* ¶ 1.
[28] *Id.* ¶ 6(h)(1).
[29] *Id.* ¶ 6(d).
[30] *Id.* ¶ 9.
[31] *Id.* ¶ 10.
[32] *Id.* ¶ 6(j).

Director, Health Services Division; Central Office Correctional Services Administrator; Regional

Director; and the Regional Correctional Administrator.[33]   These reporting protocols ensure that

BOP management, from prison staff to the Warden to the Regional Director of the BOP,

participates in the decision-making and monitoring process in the use of force, and that prison staff

do not inappropriately use force on residents.

55.   As discussed further below, virtually none of these BOP regulations were complied

with in using restraints on M.L., E.W., or K.Y.

**C.   The Named Plaintiffs' Individual Issues and Claims**

**1.   M.L.**

56.   Plaintiff M.L. has struggled with his mental health since childhood and was

diagnosed with multiple conditions prior to his first adult incarceration at 17 years old.  Over the

course of his young life, he has been diagnosed with:  (1) schizophrenia; (2) bipolar disorder;

(3) major depressive disorder; (4) generalized anxiety disorder; (5) obsessive-compulsive

disorder; (6) PTSD; (6) intellectual disability; (7) ADHD; (8) borderline personality disorder;

(9) antisocial personality disorder; (10) opioid use disorder; (11) cannabis use disorder; and

(12) phencyclidine use disorder.

57.   M.L.'s litany of diagnosed mental health conditions has resulted in several stays in

psychiatric hospitals and suicide attempts, both prior to his incarceration and during his time in

federal custody.  M.L.'s earliest suicide attempt was when he was only seven years old.

58.   At prior BOP facilities, including USP Atwater and USP Victorville, M.L. was

classified as a Mental Health Care Level 2.  He typically received clinical evaluations from

treatment staff on a monthly basis.

---

[33] *Id.* ¶ 14(a)(1)–(5).

59.     On or about March 2023, M.L. was transferred from USP Atwater to USP Lee.  At the time, Defendant Streeval was the Warden at USP Lee. Defendant Gilley became Warden, and assumed Defendant Streeval's responsibility for the provision of M.L.'s medical care[34], in February 2024.  Over the course of his transfer, M.L. received his two prescribed medications, Lexapro and Elavil, each day.  M.L. received these prescribed medications from the daily pill line at each facility, including the hold-over facilities of USP Victorville, Federal Transfer Center (FTC) Oklahoma, and USP Atlanta.  Upon arrival to USP Lee, M.L. continued to hold his Mental Health Chronic Care Level 2 designation.  Lexapro, a selective serotonin reuptake inhibitor ("SSRI"), is a medication used to reduce symptoms of depression and anxiety.  Prior to his transfer to USP Lee, and at the approximately eight other BOP facilities where he has previously been housed, M.L. received Lexapro each morning through the pill line.  But not at USP Lee.

60.     Elavil, a tricyclic antidepressant, is a medication used to treat depression and mood disorders.  Prior to his transfer to USP Lee, and at the approximately eight other BOP facilities where he has been housed, M.L. received Elavil each evening through the pill line.  But not at USP Lee.

61.     Due to M.L.'s extensive history of suicide attempts, M.L. was not eligible to self-carry his medication at any of his prior eight BOP institutions.  This decision was based on the reasonable fear held by Psychology Services staff at other BOP facilities that M.L. would attempt to overdose on his medication as a method of self-harm.

62.     M.L. arrived at USP Lee on or about April 5, 2023.  Upon arrival at USP Lee, M.L. went through, as does everyone, the Receiving and Discharging ("R&D") Department, which handles the processing of new residents.  While in R&D, M.L. encountered Defendant Wasim,

---

[34] Program Statement 5310.016 at 4.

who stated, without prompting, though clearly aware of M.L.'s history: "We don't do that psych shit here."

63.     A short time later, M.L. encountered Nurse Bowman, who provided M.L. with a seven-day supply of his Lexapro and one single pill Nurse Bowman identified as Elavil.  Nurse Bowman did not give M.L. any information about USP Lee's pill line, including its location or how and when prescribed medications are administered to residents.

64.     When M.L. arrived in his assigned housing unit at USP Lee on April 5, 2023, his unit was "locked down," meaning residents were confined to their cells and unable to move around the compound.  When the facility is on lockdown status, Health Services staff deliver medication normally received through the institution's pill line to each resident through the slot in his cell door.

65.     On April 5, 2023, M.L. self-administered his dose of Lexapro, as well as the dose of what Nurse Bowman told him was Elavil.

66.     On April 6, 2023, M.L. self-administered his dose of Lexapro in the morning.  He received his Elavil in the evening from USP Lee Heath Services staff who brought the dosage to M.L.'s cell door.

67.     When Health Services staff brought M.L. his dose of Elavil on April 6, 2023, staff never asked for identification or to confirm his identity.  Upon information and belief, USP Lee staff also failed to document the distribution of M.L.'s medication as required by P.S. 6360.001.[35]

68.     On April 7, 2023, M.L.'s unit was removed from lockdown status.  As such, residents, including M.L., were permitted to move around the USP Lee compound, including to go to the cafeteria and pill line.

---

[35] Program Statement 6360.01 at 18–19 (requiring that when a resident is given medication in any way, it must be documented in the MAR).

20

69.     Following dinner, because no one at USP Lee had ever told him where or how he could receive his prescribed medications, M.L. did not know where he was supposed to go for the pill line, and he missed his dose of Elavil.

70.     M.L.'s unit was locked down again on or about April 8, 2023.  On or about April 8 and 9, 2023, M.L. took a dose of Lexapro from the seven-day supply he had been given by Nurse Bowman, and USP Lee staff brought him his Elavil in the evening.

71.     On April 10 and 11, 2023, while M.L.'s unit was still locked down, USP Lee staff did not bring him his Elavil.  When the lockdown was lifted on or about April 12, 2023, M.L. went to the Health Services window during pill line, and asked to receive his Elavil.

72.     M.L. was informed that his prescriptions for both Lexapro and Elavil were discontinued, and he was directed to talk to Psychology Services for more information.  Later that same day, M.L. spoke to Defendant Wasim.  Defendant Wasim directed M.L. to speak with Defendant York from Health (not Psychology) Services.

73.     M.L. sent multiple written requests to Defendant York inquiring about his medication.  M.L. received one response, which directed him to talk to Psychology Services about his diagnoses and requests to receive his prescribed medications.

74.     Eventually, M.L. requested and received a copy of the documentation from his most recent clinical encounter, which falsely indicated that M.L. saw Defendant York on May 11, 2023. The medical record from the purported clinical encounter indicated that Defendant York had explained to M.L. that his medication was being discontinued as a result of medication non-compliance—specifically that M.L. had missed 14 doses of Lexapro and one dose of Elavil on April 7, 2023.

21

75.    In fact, M.L. had never missed or refused doses of his Lexapro.  He took his Lexapro from the supply he had been given by Nurse Bowman.  USP Lee staff simply failed to document this self-administration.  Moreover, discontinuing mental health medication based solely on non-compliance violates BOP policy.[36]  At the time USP Lee staff determined to discontinue his medication, M.L. had never had, and still has not had, a substantive meeting or evaluation from anyone at USP Lee's Psychology Services.  Accordingly, USP Lee staff violated BOP policy in discontinuing M.L.'s medication.

76.    M.L. later obtained and reviewed his Psychology Services records, which included an entry on June 12, 2023 indicating his Mental Health Care Level had been lowered from Level 2 to Level 1.  That entry in M.L.'s records states that upon M.L.'s transfer to USP Lee, Health Services and Psychology Services had made a joint decision to discontinue M.L.'s medications.  A separate entry from M.L.'s Psychology Services record dated April 6, 2023 states that M.L.'s friendly mood and ability to engage with other residents in R&D, coupled with an allegedly comprehensive review of his suicidal history and a purported clinical interview (that never occurred), confirmed for USP Lee staff that M.L.'s nearly 20-year struggle with his mental health was not real, and that the multiple medical and psychological personnel who had concluded otherwise were wrong.  A positive interaction during the intake process at USP Lee following his transfer and a cursory review of M.L.'s file resulted in USP Lee staff overriding nearly twenty-years of documented mental health problems and a decision not to administer and of M.L.'s prescribed medications for his diagnosed mental health conditions.

---

[36] *Psychiatry Services*, Fed. Bureau of Prisons at 12 (Jan 15. 2005), https://www.bop.gov/policy/progstat/6340_004.pdf (medication "[n]oncompliance should not be the determining factor for exclusion from the Mental Health Care Clinic").

77.    The June 12, 2023 entry in his records also indicated that M.L. had been clinically observed for more than two months, and that during that time M.L. never demonstrated acute symptomology of a mental illness.  Upon information and belief, since his arrival at USP Lee, M.L. has not had one, let alone a series, of clinical encounters with any Psychology Services staff.  Indeed, M.L. was transferred from the compound to the SHU on May 8, 2023, where he remained until June 22, 2023.  During that time, Psychology Services staff at USP Lee never conducted even a 30-day SHU review[37] of M.L. to assess his mental health, as required by BOP policy, let alone engaged with M.L. in a way that would allow them to fairly or competently assess his health and make any determination to discontinue his prescribed medications.

78.    In the month following the discontinuation of his mental health medications, M.L. submitted multiple written requests to USP Lee staff, requesting to speak with Psychology Services regarding his symptoms of anxiety, depression, and difficulty sleeping.

79.    As a result of the discontinuation of his medication by the Defendants, M.L. has experienced several severe mental and physical injuries.  Specifically, M.L. has suffered a multitude of physical symptoms consistent with abrupt SSRI and tricyclic discontinuation, including severe headaches, sweating, insomnia, dizziness, anxiety, aggression, and periods of mania.

80.     On May 8, 2023, M.L. submitted a written request to Defendant Wasim about the increasing severity of his symptoms, including recent manifestations of suicidal ideation.  Around 12:45 p.m., M.L. was removed from his cell and escorted to the Lieutenant's office.  Once at the Lieutenant's office, M.L. was instructed to sit down and wait, unaware of what was coming next.

---

[37] Program Statement 5270.11 at 7 (stating that a 30-day SHU review is required "[a]fter every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation status, the [Segregation Review Official] will formally review your status at a hearing you can attend").

23

After some time waiting, Defendant Wasim entered the office and instructed M.L. to "not fuck with [him]," expressly referencing M.L.'s multiple requests to Psychology Services:  (1) for treatment; and (2) to be placed back on his medications.

81.    Shortly following this statement by Defendant Wasim, Officer Thomas stripped and placed M.L. into paper clothing, including a paper shirt and an orange pair of paper panties, and gave M.L. a white helmet for his head.  M.L. was then placed into ambulatory restraints, sat down in a restraint chair, and transported to a holding cell in the SHU.

82.    After arriving in the SHU, M.L. was wheeled into a holding cell where he was positioned up against the back wall, still strapped into the restraint chair.  Once positioned, an unknown Assistant Warden grabbed a restraint belt off the chair and used the belt to choke M.L.

83.    Shortly thereafter, around 1:20 p.m., Defendant Nurse Baker entered the holding cell to perform an injury assessment of M.L.  Once the assessment concluded, M.L. was instructed by staff to stand up, bend over at the waist, and walk backwards to another holding cell.  While in this position, M.L.'s buttocks were exposed to the officers and other residents being held in the SHU because of the small paper panties the officers forced M.L. to wear.

84.     Once in the new holding cell, M.L. was told to kneel against the back wall, while a group of officers, including Lieutenant Hamilton and Defendant Bradburn, rammed M.L. into the wall with a riot shield, further pressing the shield into the backs of M.L.'s knees and forcing his face into the concrete wall.  The impact of the initial hit caused M.L.'s mouth to start bleeding.

85.    Attempting to stop the abuse from going any further, M.L. expressed that he had a family that loved him, and he already had a pending lawsuit for excessive force at another BOP facility.  Lieutenant Hamilton questioned, "you going to sue me?"  M.L. did not respond, and was pushed further into the concrete wall by Defendant Bradburn who was holding the riot shield, and

24

was then slapped in the face by Lieutenant Hamilton.  USP Lee staff then proceeded to exit the holding cell.

86.    Approximately 15 minutes later, from outside the holding cell, Defendant Bradburn exclaimed, "stop banging your head against the wall, stop banging your head" despite M.L. doing nothing of that sort.  Soon after, Defendant Bradburn pressed the emergency distress button and a flock of USP Lee staff, including the same unknown Assistant Warden, Defendant Wasim, Lieutenant Hamilton, and Defendant Bradburn, rushed into the holding cell and began kicking and punching M.L. throughout his body.  M.L. was then picked up off the floor and strapped into a restraint chair.  As staff wheeled M.L. to another area of the SHU, C-Range, Defendant Wasim shouted, "you tried to assault one of my officers!"  Not once had M.L. attempted to assault anyone.

87.    Upon reaching cell 156 on C-Range, M.L. was removed from ambulatory restraints and placed into 4-point restraints atop a concrete block.  Soon thereafter, Lieutenant Hamilton instructed M.L. that Health Services staff were going to perform a videotaped injury assessment, and M.L. was to report  "no injuries" when the video camera was recording.  Lieutenant Hamilton further threatened that if M.L. did not comply with his directives he would be further beaten.  M.L. complied, reporting that he had no injuries.

88.    Approximately two hours later, with M.L. still in 4-point restraints, Lieutenant Hamilton and Lieutenant Corbin entered the holding cell to apply an extra set of restraints to M.L.'s wrists and ankles. These additions meant that M.L. now had two restraints on each of his extremities.  The restraints were applied so tight that they punctured M.L.'s skin, leading to open cuts and swelling of his extremities.

89.    Every two hours, a group of USP Lee staff entered the cell to further assault M.L. The physical attack included Office Bradburn punching M.L. in the groin, officers ramming the

riot shield into M.L.'s groin, Officer Brooks laying the riot shield on top of M.L. and walking over his body and head, Defendant Gilbert punching M.L. in the face and leaving a black eye, and various officers punching, slapping, and kicking M.L. all over his body.  M.L. was not allowed to use the restroom at any point during the torture, nor was he offered food or water.

90.     In addition to the physical torture of M.L., USP Lee staff used racial slurs and otherwise made derogatory remarks to M.L.  On three different occasions, staff continued their emotional torture of M.L. by teasing that they would be removing him from the restraints at the next two-hour mark.  On each of the three occasions where staff did so, M.L. was not removed from his restraints and instead faced additional physical torture by USP Lee staff.

91.     During the approximate 15 hours he remained in 4-point restraints, M.L.'s interaction with USP Lee Health Services staff was extremely limited.  After 10:00 p.m., M.L. does not recall any medical staff entering the cell to perform any sort of restraint check as is required by BOP policy.

92.     Around 4:00 a.m. on May 9, 2023, USP Lee staff, including Lieutenant Corbin, removed M.L. from the 4-point restraints.  Because M.L. was double restrained, and the key holes of the two restraints were facing each other, Lieutenant Corbin forcefully moved M.L.'s legs in an unnatural manner to remove the hardware.  When doing so, the restraints dug deeply into the open wounds on M.L.'s ankles, causing him to scream from excruciating pain.

93.     From the 4-point restraints, M.L. was transitioned into ambulatory restraints.  Again, these restraints were applied in an excessively tight manner and continued to agitate his open wounds.

94.     Having not used the restroom after approximately 15 hours, M.L. pleaded with Lieutenant Corbin to let him use the restroom.  Lieutenant Corbin complied with the request, and

then proceeded to escort M.L. to the same holding cell where he was previously held in ambulatory restraints hours earlier.

95.    Upon entering the holding cell, M.L. noticed that the cell walls and floors were now covered with what he recognized to be debris from mace balls.  M.L. proceeded to tell Lieutenant Corbin that he knew that it was mace covering the cell.  Lieutenant Corbin, smiling, ordered M.L. to sweep up the mess, further threatening to place him back in the 4-point restraints if he did not.

96.    Being that he was in ambulatory restraints and barefoot, M.L.'s ability to sweep up the mace and debris was extremely limited.  About an hour after receiving the order from Lieutenant Corbin, Officer Fields came to bring M.L. a suicide smock.  Officer Fields recognized that the holding cell was covered in mace and proceeded to move M.L. to a clean cell.

97.    Once in the new cell, M.L. was again ordered to remain kneeling against the concrete cell wall whilst still in ambulatory restraints that continued to agitate the open wounds on his ankles and wrists, while the belly chain dug into his waist. When USP Lee staff entered M.L.'s cell, they again rammed the riot shield into his body and slammed it on into the back of his knees.

98.    At approximately 9:00 a.m., Captain Bowles and Lieutenant Parsons released M.L. from the ambulatory restraints.  When doing so, Captain Bowles ordered M.L. to "shut the fuck up" and to not cause any problems.  M.L. was then placed in cell 119 on C-Range.

99.    Following the events of May 8 and 9, 2023, M.L. was issued three falsified incident reports: a 204 for "biting someone's hand," a 203 for "threatening staff," and a 228 alleging that M.L. engaged in "self-mutilation."  These disciplinary infractions were presumably issued to justify Defendants abuse and to conceal their true motive for assaulting M.L.—to avoid being bothered by his requests for his prescribed medications and treatment for his diagnosed mental health conditions.

27

100.    The assault of M.L. by USP Lee staff was in retaliation for M.L. asking to speak with Psychology Services after being denied access to mental health treatments and his prescribed medications at USP Lee.  Even so, Defendant York discontinued M.L.'s mental health medications just two days after he was released from 4-point and ambulatory restraints—May 11, 2023.  These actions by USP Lee staff caused M.L. to suffer additional physical, mental, and emotional injuries.

101.    As noted above, on June 12, 2023, M.L.'s Mental Health Care Level was downgraded by USP Lee staff from a Care Level 2 to a Care Level 1, removing M.L. from Mental Health Chronic Care Level status.[38]  At USP Lee, M.L. has had no interaction with Psychology Services staff regarding this decision, and has never been provided with an explanation for the downgrade of his Care Level.  This downgrade by USP Lee staff was not based on any actual clinical, physical, or psychological examination of M.L.

102.    M.L. has been denied access to his psychiatric medications and related clinical evaluations since his arrival at USP Lee in April 2023.  Defendant Wasim and other members of the Psychology Services staff at USP Lee have falsified M.L.'s mental health records to describe clinical interactions and examinations of M.L. that have never occurred.  And M.L. has experienced severe violence from USP Lee staff in retaliation for him merely requesting that he receive prescribed medication and treatment for his diagnosed mental health conditions.

103.    In addition to the near 20-hour beating he suffered at the hands of USP Lee staff while in restraints between May 8 and May 9, 2023, on February 28, 2024, following additional requests for mental health care by M.L., Defendant Wasim slapped M.L. in the face.  As of the filing of this Second Amended Complaint, M.L. has never received any clinical evaluation nor had

---

[38] Care Level Classification Guide at 1–2.

any substantive interaction with the Psychology Services staff at USP Lee. All representations of such alleged interactions in M.L.'s medical file are false.

104.    As a result of Defendants' failure to provide adequate mental health care, M.L. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

### 2.    E.W.

105.    Plaintiff E.W. has struggled with mental illness since the early 1980s after being sexually abused as a young child. Following this experience, E.W., assisted by his mother, sought mental health treatment, beginning his decades-long interaction with mental health care professionals. At approximately six years old, E.W. began taking psychiatric medication and receiving therapy to help manage the anxiety and fear he experienced following the sexual abuse he had suffered.

106.    For over 40 years, E.W. has been treated for various mental illnesses, including generalized anxiety disorder, major depressive disorder, obsessive-compulsive disorder, ADD, and PTSD. His symptoms have included anxiety, panic attacks, depression, and delusional periods of psychosis.

107.    Prior to his transfer to USP Lee and at other BOP facilities, E.W. had been prescribed Sertraline, Trazadone, Celexa, and Remeron to help treat his diagnosed physical and psychological conditions and their related symptoms.

108.    Prior to his transfer to USP Lee, E.W. was classified as a Mental Health Care Level 2 and received monthly clinical consultations from Psychology Services at other BOP facilities, including USP Pollock and USP Thomson.

109.    When E.W. arrived at USP Lee on February 8, 2023, he possessed a 10-day supply of his psychiatric medications, Celexa and Remeron, which he kept on his person.  On his initial intake form, E.W. specifically disclosed to the USP Lee staff that he was in the midst of a mental health crisis and experiencing both physical and emotional distress.  On the same form, E.W. stated that he needed clinical intervention for these issues and requested to speak with Psychology Services.

110.    At the time of E.W.'s arrival to USP Lee, Defendant Streeval was the Warden. Defendant Gilley became Warden,and assumed Defendant Streeval's responsibility for the provision of E.W.'s medical care,[39] in February 2024.

111.    Despite making it known to USP Lee staff that he was experiencing a mental health crisis, E.W. was never seen by Psychology Services following his arrival at USP Lee.  Despite it never occurring, E.W.'s medical records indicate that he received clinical attention on February 9, 2023 and was evaluated by Defendant Wasim.

112.    After E.W. ran out of his 10-day supply of Remeron and Sertraline, he submitted a request for refills to USP Lee staff on or around February 18, 2023.  To his surprise, an unknown Health Services staff member informed E.W. that he could not process the refill of the Remeron, and instructed E.W. to check back at the end of the month for an update regarding his prescription. E.W.'s prescription for Sertraline was renewed.

113.    When E.W. ceased to receive his Remeron, he began to experience extreme physical, mental, and emotional distress.  These symptoms included:  suicidal thoughts, tremors, trouble sleeping, sensory disturbances, nausea, vomiting, decrease in appetite, mood swings, agitation, anxiety, depression, irritability, sweating, headaches, and dizziness.

---

[39] Program Statement 5310.016 at 4.

30

114.    At the end of February 2023, E.W. was informed by Health Services that he was discontinued from receiving Remeron, and he would need to speak with Psychology Services for further information.

115.    E.W. began to submit written and electronic requests to both Psychology Services and Health Services inquiring about the status of his medication.  Neither Psychology Services nor Health Services provided any meaningful assistance to E.W.  Instead, E.W. was repeatedly told by either Psychology Services or Health Services that he needed to talk with the other about the reinstatement of his prescription.

116.    On April 4, 2023, E.W. was seen by Health Services for a 30-day medical review. During this interaction, E.W. asked for an update regarding the status of his prescription for Remeron.  He was again informed that he was discontinued from his Remeron prescription.

117.    During his medical review on April 4, 2023, E.W. asked Defendant York why he was losing weight and so quickly.[40]  Defendant York hypothesized that it could be due to the discontinuation of his psychiatric medication, further instructing E.W. to contact Psychology Services for more information.  Defendant York implied that although he had the ability to prescribe this medication for E.W., professional courtesy dictated that he defer to Psychology Services on this decision.  E.W. was offered no further assistance from Defendant York during this interaction.

118.    Frustrated by this run-around, E.W. began to utilize the administrative grievance process on April 11, 2023, in an attempt to secure access to mental health and medical care at USP Lee.  However, despite arriving from another BOP facility with a 10-day supply of mental health medication; despite disclosing that he was in the midst of a mental health crisis on arrival

---

[40] From February 8, 2023 to April 4, 2023, E.W. lost approximately 35 pounds.

31

to USP Lee; despite written requests to staff in both Health and Psychology Services inquiring about his medication; and despite submitting multiple administrative grievances on these same issues, E.W. received absolutely no responses to his requests for medical or mental health treatment from staff at USP Lee until he was the victim of a stabbing in May 2023.

119.    On May 18, 2023, E.W. again began to experience a mental health emergency with suicidal thoughts, consistent with a period of delusional psychosis.  Recognizing that he may be a danger to himself or others, E.W. verbally requested to be isolated from his cellmate and placed on suicide watch.  USP Lee staff took no action in response to these requests:  he was not isolated, he was not placed on suicide watch, and he was not seen by Psychology Services or Health Services.  E.W. remained in his unit, housed in the same cell with his same cellmate, without receiving any mental health care.

120.    On the night of May 21, 2023, while experiencing suicidal thoughts, E.W. again requested to be isolated for his and his cellmate's safety.  USP Lee staff removed E.W. from his cell and placed him alone in a different cell on his unit.  Then, the staff attempted to force E.W. to choose a new cellmate in an effort to cause an altercation.  When E.W. refused to do that, USP Lee staff placed E.W. into a suicide observation cell at approximately 8:30 p.m.

121.    Around 6:00 a.m. on May 22, 2023, while still experiencing symptoms of delusional psychosis, E.W. was taken out of the observation cell, and placed back in his cell on his unit with his same cellmate.  Three or four times throughout the day, E.W. asked correctional officers on his unit to call Psychology Services, and repeatedly requested his mental health medication.

122.    Around 4:00 p.m., E.W. attempted to press the emergency button in his cell because he was experiencing intense panic attacks and periods of delusional psychosis with suicidal

thoughts.  However, the emergency button was not operational, forcing E.W. to kick the cell door to gain the attention of USP Lee staff.  After multiple attempts to get the staff's attention, a USP Lee staff member, Officer Bates, approached E.W.'s cell.  Officer Bates told E.W. and his cellmate that the only way either of them could get help is if there is a physical altercation.

123.    At approximately 4:05 p.m. on May 22, 2023, while continuing to suffer both panic attacks and periods of delusional psychosis, E.W. was bitten and stabbed by his cellmate.  E.W.'s physical injuries were treated by Health Services but, again, and despite continued pleas for help, he was refused the opportunity to speak with Psychology Services regarding his ongoing mental health crises.

124.    Following the assault, E.W. was prescribed five days of an antibiotic to treat his injuries.  After the medication was finished, E.W. put in at least three written requests to Health Services staff seeking follow-up wound care and pain management assistance.  His requests fell on deaf ears as he received no follow-up medical attention for his injuries.

125.    E.W. was issued a false incident report for fighting, and remanded to the SHU for 30 days awaiting his DHO hearing.  E.W. was not the primary aggressor during the altercation, nor did he attempt to attack his cellmate.  He was the victim of the assault.

126.    Shortly after being released from the SHU, on or around June 28, 2023, E.W. submitted another written request to Defendant Wasim for treatment of his current and ongoing mental health ailments.  Among other symptoms, E.W. was hearing voices, visually hallucinating, experiencing suicidal and homicidal ideations, feeling shortness of breath, sweating, shaking, suffering from loss of appetite, and having trouble sleeping.

127.    In retaliation for these requests for help, on June 30, 2023, E.W. was taken to the Lieutenant's office in the SHU, surrounded by various USP Lee staff members, including

33

Defendant Bullock, Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker and other unknown officers.

128.    Defendant Bullock began to question E.W. about his request to staff.  When given the opportunity to respond, E.W. attempted to regurgitate the contents of his request, but was cut off by Defendant Bullock who told E.W. that he was "full of it."  Defendant Bullock then stated that she "didn't think [E.W.] was suicidal and [she] was not going to do anything" to help him. She then stated that if he continued to submit requests to staff regarding his mental health, she would have him written up for harassment.

129.    After Defendant Bullock left the office, Captain Bowles announced that since E.W. was not a "psych problem" he was instead a "security problem."  E.W. was then stripped of all his clothes and dressed into a paper suit by Officer Baker.  While he was being stripped, Lieutenants Maxey and Roberts removed, read, and then threw away a BP-9 sensitive administrative grievance form from E.W.'s pocket that E.W. had prepared and intended to submit that day.  E.W. was issued a false incident report for "threatening bodily harm."  He was then placed into ambulatory restraints, a helmet, strapped to a restraint chair, and wheeled to the SHU.

130.    Once in the SHU, E.W. was placed in a holding cell while still in the ambulatory restraints.  For the next twelve hours, E.W. was physically and emotionally tortured by USP Lee staff for simply requesting mental health treatment.

131.    At 9:42 a.m., shortly after his arrival in the SHU, Nurse Stuart Scott entered the observation cell to perform a restraint check on E.W.  Despite the restraints digging into E.W.'s wrists, ankles, and belly, Nurse Stuart Scott indicated in his report that there was "no circulatory impairment noted."  Nurse Stuart Scott failed to take any of E.W.'s vital signs during this interaction.

132. Every 15 minutes, Lieutenant Mitchell and an unknown officer performed visual checks of E.W. by walking by the cell door and peering into the window. These checks continued until the afternoon shift change. During one of their checks, E.W. was asked what he did to get himself in the instant situation. After E.W. finished explaining what happened in the Lieutenant's office, Lieutenant Mitchell advised E.W. to "never use the 's' word at Lee County." She was referring to the word "suicide."

133. Due to the frequency of their checks, and having been placed on suicide watch in the past, E.W. believed that he was not in the SHU for a disciplinary infraction. However, E.W. soon learned that he was in fact on "ambulatory restraint watch" after attempting to explain he was suffering from a mental health crisis when USP Lee staff entered the holding cell for a 2-hour restraint check. It was during these periodic checks that staff would enter the holding cell and pin E.W. up against the concrete wall with a riot shield, step on the back of his feet with heavy work boots, and dig the shield into the back of his knees as he remained kneeling.

134. At approximately 3:00 p.m., around the afternoon shift change, E.W. was taken into another observation cell. Once there, Officer Long, accompanied by Nurse Sarena Scott, Nurse Stuart Scott, and an unknown Lieutenant, proceeded to tighten E.W.'s wrist restraints to the point E.W.'s hands would swell to the size of oranges. After his wrist restraints were adjusted, Nurse Stuart Scott instructed E.W. to "suck his stomach in" and proceeded to tighten the belly chain to the last notch such that it dug further into E.W.'s skin. Before leaving, Nurse Stuart Scott instructed E.W. to tell Nurse Sarena Scott that she was a "bitch." In fear of further harm, E.W. complied. The unknown Lieutenant then proceeded to sarcastically ask E.W. how his hands were. Before he could respond, Nurse Stuart Scott whispered to E.W., "you got two more hours."

35

135. In his report of this restraint check, Nurse Stuart Scott notes that E.W.'s restraints had shifted up E.W.'s forearms and they were "adjusted to correct position." He further noted that there was "no circulatory impairment noted after adjustment." This report fails to depict the excessive swelling to E.W.'s wrists or his instructions for E.W. to further suck his stomach in to make the waist restraint even tighter.

136. While his restraints were fashioned in this manner, every 2 hours, staff entered the holding cell to physically assault E.W. The assaults continued to include excessively pushing E.W. into the concrete wall with the riot shield, standing on the backs of his feet, and pushing the riot shield into the backs of E.W.'s knees. On certain occasions, staff would kick E.W. when he attempted to reason with them about his mental health crises.

137. At 7:15 p.m., Nurse Ernest Ashley performed a 2-hour restraint check on E.W. In his report of the encounter, Nurse Ashley notes that E.W. is in no apparent distress and his restraints do not appear to be restricting his circulation. This report again fails to mention the excessively tight nature of E.W.'s restraints.

138. Around 10:30 p.m., E.W. was released from the ambulatory restraints. His injuries included swelling and bruising of his hands and feet, as well as open cuts to his wrists, waist, and ankles. To this day, E.W. has permanent scarring on his wrists, ankles, and waist from the ambulatory restraints.

139. Following this physical assault, Psychology Services staff discontinued E.W.'s Celexa prescription, leaving E.W. with no mental health medication whatsoever. E.W. was neither provided with notice of why his medication was being discontinued, nor why he did not receive a clinical evaluation from Psychology Services staff prior to this discontinuation of his prescribed medication.

140.    As a result of Defendants' failure to provide adequate mental health care, E.W. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

**3.    S.W.**

141.    Plaintiff S.W. has struggled with anxiety disorder, depression, and panic attacks since he first attempted suicide on January 29, 2022 while in custody at USP Atwater.

142.    Following his failed suicide attempt, S.W. received a DSM-V diagnosis of unspecified anxiety disorder and an accompanying medical diagnosis of anxiety disorder.  Based on these diagnoses, S.W. was prescribed and began taking Remeron in February 2022 at USP Atwater.

143.    Mirtazapine, more commonly referred to as Remeron, is an antidepressant, and is used primarily for the treatment of major depressive disorder and other mental health conditions, such as generalized anxiety disorder and PTSD.  This medication helped to reduce S.W.'s anxiety and reduced the frequency of his panic attacks.

144.    At other BOP facilities, including USP Beaumont, USP Atwater, USP Victorville, USP McCreary, and USP Pollock, S.W. was prescribed Oxcarbazepine or Duloxetine to help treat severe lower back pain that presented in October 2018 as a result of an injury after he was forced to sleep on a metal bunk without a mattress at Federal Correctional Institution (FCI) McKean for an extended period of time.  Oxcarbazepine and Duloxetine are pain medications, but they are also known to help stabilize moods and control emotions in individuals who are diagnosed with depression, anxiety, and other psychological disorders.

145.    When S.W. was transferred to USP Victorville from USP Atwater in 2022, his prescriptions for both Remeron and Oxcarbazepine remained in place, and he received these

mediations.  S.W. received the Oxcarbazepine twice a day via the pill line and self-carried his Remeron to take once per day.  As he moved through FTC Oklahoma and USP Atlanta on his way to USP Lee, S.W. continued to receive Oxcarbazepine twice a day via the pill line and carried his Remeron on his person.

146.    S.W. was transferred to USP Lee on August 10, 2022.  At this time, Defendant Streeval was the Warden at USP Lee. Defendant Gilley became Warden, and assumed Defendant Streeval's responsibility for the provision of S.W.'s medical care[41], in February 2024.  Upon his arrival at USP Lee, S.W. was able to self-carry both of his medications.  He continued to take Remeron once a day and Oxcarbazepine twice a day.

147.    On August 19, 2022, Defendant York performed a 14-day chronic care evaluation of S.W.  In his report, Defendant York wrote that S.W. would be continued on both Remeron and Oxcarbazepine.  This was S.W.'s only interaction with Defendant York at USP Lee.

148.    On February 16, 2023, during a six-month follow-up with Health Services at USP Lee for his medication renewal, Defendant Nancy Smith quoted S.W. as saying his "'medication is helping a lot,'" indicating that the medications reduced S.W.'s symptoms of anxiety and depression, as well as his physical back pain.  Additionally, Defendant Nancy Smith's report from this interaction stated S.W. was 98–99% compliant with his medication over the last six months.

149.    The following day, on February 17, 2023, Defendant Nancy Smith reported that after discussing with "MD," upon information and belief Defendant York, "[S.W.] will be discontinued from Oxcarbazepine and placed on Elavil, in the place of Remeron, to treat both his anxiety and back pain."  When his prescription was switched to Elavil, S.W. received the

---

[41] Program Statement 5310.016 at 4.

medication through USP Lee's pill line.  Compared to Remeron, Elavil did little to reduce S.W.'s racing thoughts and overall worry, causing S.W. to struggle to sleep.

150.    On July 21, 2023, Defendant York falsified the record of a clinical encounter with S.W.  The record of this alleged encounter reflects that Defendant York found that S.W.'s diagnosis of "anxiety disorder" was "resolved."   However, S.W.'s February 2022 DSM-V diagnosis of "unspecified anxiety disorder" from USP Atwater remained.   Thus, Defendant York's classification of S.W.'s mental disorder as "resolved" was unsubstantiated.  Indeed, Defendant York never met with S.W., never conducted a clinical evaluation of S.W., and falsified S.W.'s records to indicate that his diagnosed mental health conditions had "resolved."

151.    As a result of Defendant York's false and unfounded change of diagnosis, S.W. no longer received refills of his Elavil medication, the only mental health medication he was receiving at this time.  S.W. took his last dose of Elavil in September 2023.  Prior to the discontinuation of his medications, and despite Defendant York's claims, S.W. was neither seen nor evaluated by Defendant York or by anyone in either Psychology Services or Health Services to discuss the alleged "resolution" of his anxiety disorder.

152.    Following S.W.'s last dose of Elavil in September 2023, S.W. was not seen by either Psychology Services or Health Services to discuss whether his symptoms had returned.  Indeed, immediately after he ceased to receive his medications, S.W. began to experience manifestations of his anxiety disorder, including increased worry, panic, depression, trouble sleeping, increased heart rate, and loss of appetite.

153.    During the same month, S.W. submitted at least three written requests to Psychology Services for assistance with his symptoms and medications.  Psychology Services responded that they were not responsible for his medications and directed him to inquire further

39

with Health Services.  S.W. submitted at least two written requests to Health Services in which he requested to be seen by a physician, but Health Services never saw him.  Neither Health Services nor Psychology Services provided S.W. with any assistance whatsoever.

154.    In late September 2023, S.W. was placed in the SHU.  Once he arrived in the SHU, on September 26, 2023, and September 27, 2023, S.W. submitted two written requests regarding his medications and treatment for symptoms related to both his mental and physical health conditions.  Defendant Nurse Baker reviewed the requests, came to his cell, and told S.W. that his medications needed to be renewed.  But despite Defendant Nurse Baker's acknowledgement, S.W.'s prescribed medications were not renewed, and he was not seen or evaluated by Psychology Services or Health Services staff at USP Lee.

155.    After nearly a month without his prescribed mental health medications, S.W. began experiencing increasing symptoms of depression and anxiety, including a severe decline in his mood, persistent sadness, and restlessness.  He also experienced mood swings and night sweats.

156.    On October 4, 2023, in response to one of his many written requests to Health Services, S.W. was informed by Nurse Leon Caudill, both verbally and in writing, that he had been discharged from chronic care.

157.    Frustrated by the lack of responsiveness to his concerns, on October 11, 2023, S.W. began to submit administrative grievances concerning his downgrade from chronic care and requesting that USP Lee provide his prescription medications and treat his previously diagnosed medical and mental health conditions. USP Lee responded to S.W.'s October 11, 2023 grievance without providing any assistance, relying upon Defendant York's July 2023 false report indicating that S.W.'s diagnosed conditions had been "resolved" and instructing him to seek assistance from Psychology Services.

158.    On October 26, 2023, S.W. submitted a written request slip to Defendant Bailey in Psychology Services concerning his increasingly severe symptoms as a result of not receiving his prescribed mental health medications.  Defendant Bailey again gave S.W. the run-around, telling him to talk to Health Services about his mental health medication concerns.

159.    Notwithstanding his submission of multiple administrative grievances, as of the filing of this Complaint, S.W. has not received medical assistance or mental health care treatment, and his prescriptions have not been renewed.

160.    As a result of Defendants' failure to provide adequate mental health care, S.W. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

4.    K.Y.

161.    Plaintiff K.Y. has struggled with his mental health since early adolescence. Over the course of his life, he has been diagnosed with schizophrenia, major depressive disorder, manic depression, attention deficit disorder, and unspecified mood disorder.

162.    Starting at age nine, K.Y. was repeatedly drugged and molested by a trusted adult in his life, and soon after began to struggle with depression.  These feelings of depression would be exacerbated as K.Y. also struggled with food instability, ultimately resorting to stealing to be able to eat.

163.    By age twelve, K.Y. was incarcerated for the first time.  While in juvenile detention, K.Y. received mental health counseling and psychiatric medication to help reduce his depression.

164.    After being released from juvenile detention, at age thirteen, K.Y. was shot in a drive-by shooting.  Following this gunshot injury, K.Y.'s depression became worse, and he began to experience new mental health symptoms, including anxiety, paranoia, suicidal ideation, and both

41

audio and visual hallucinations.  These symptoms would lead K.Y. to feel helpless and hopeless, resulting in over 30 failed suicide attempts.

165.    From 2001 to 2004, and again in 2010, K.Y. was incarcerated at the Bullock Mental Health Correctional Facility.  This facility was a specialized medium custody correctional facility within the Alabama Department of Corrections that housed and provided treatment to mentally ill individuals.  When he was not housed at the Bullock Mental Health Correctional Facility, K.Y. also spent time in the Shelby County Jail, Clay County Jail, Pickens County Jail, Hoover City Jail, and Walker County Jail.  Throughout his incarceration in the Alabama Department of Corrections as an adult, K.Y. was prescribed different anti-psychotics and antidepressants, including Haloperidol, Abilify, Prozac, Lexapro, Elavil, and Remeron.

166.    During the periods when he was not incarcerated, K.Y. continued to take his medications as prescribed.  Despite his medication compliance, K.Y. admitted himself to several psychiatric hospitals, including Shelby Baptist Hospital and North Harbor Pavilion in Alabama, to seek help in those instances where he recognized he may harm himself.  He has been admitted for psychiatric care on at least five different occasions during those periods he was not actively incarcerated.  At one point, K.Y. received disability benefits from the federal government as he was deemed too mentally ill to work.

167.    Despite the multiple treatment regimens he has received, K.Y. has remained in and out of state custody throughout adolescence, early adulthood, and leading up to his eventual transfer to the BOP in 2021.  Undoubtedly, K.Y.'s persisting mental health struggles have been a significant cause of his persistent periods of incarceration.

168.    In 2021, K.Y. became a resident of USP McCreary and was designated a Mental Health Care Level 1 and diagnosed with schizophrenia, major depressive disorder, and anxiety.

42

He had monthly encounters with Psychology Services staff.  Psychology Services prescribed K.Y. with Remeron to treat K.Y.'s mental conditions.

169.    In February 2022, K.Y. was transferred to USP Pollock.  While at USP Pollock, K.Y. did not receive a psychological evaluation.  Although Psychology Services never performed a psychological evaluation on K.Y., Psychology Services staff indicated in K.Y.'s medical records that his diagnosis of schizophrenia was "resolved," without any justification. As a result, he was taken off Remeron and prescribed Zoloft, an antidepressant, that did little to reduce his depression and hallucinations.  After only four months, K.Y. was transferred to USP Atwater.

170.    During his transfer to USP Atwater, while at FTC Oklahoma, K.Y. experienced a mental health crisis that eventually culminated in a failed suicide attempt.  At the time, K.Y. was taking the Zoloft prescribed by USP Pollock Psychology Services according to the medical provider's instructions.  K.Y.'s mental health symptoms never improved while he was taking Zoloft.

171.    Once at USP Atwater, K.Y. was reevaluated and prescribed both Elavil and Remeron.  He met with Psychology Services staff multiple times a month and experienced great symptom reduction with these treatment modalities.  K.Y.'s mental health symptoms improved during his stay at USP Atwater, the facility he remained at until he was redesignated to USP Lee.

172.    While in transit to USP Lee, K.Y. had a stopover at USP Atlanta and received a holdover supply of his medication, Elavil and Remeron.   K.Y. arrived at USP Lee on April 5, 2023.  At the time of K.Y.'s arrival, Defendant Streeval was the present Warden.  Defendant Gilley became the Warden, and assumed Defendant Streeval's responsibility for the provision of K.Y.'s medical care[42], in February 2024.

---

[42] Program Statement 5310.016 at 4.

43

173.    Because K.Y. has been a victim and traumatized by instances of sexual harassment perpetrated by cellmates with whom he has shared a double cell, K.Y. sought to inform USP Lee staff of his need to be housed in a single cell upon his arrival.  While in R&D, K.Y. attempted to contact Defendant Wasim to discuss his mental health.  Specifically, K.Y. asked Defendant Wasim about the possibility of being placed in a single cell to better manage his mental health.  Instead of listening to K.Y.'s concerns, Defendant Wasim told K.Y. that he would not be receiving mental health treatment at USP Lee.

174.    Despite his pleas to Defendant Wasim, K.Y. was designated to a double cell on I-Unit, which happened to be locked down at the time of K.Y.'s arrival.  As soon as he was placed in the double-cell, K.Y.'s symptoms worsened, leading to manifestations of suicidal ideation.

175.    While I-Unit was locked down, Health Services staff failed to deliver K.Y.'s daily dosages of Remeron and Elavil that he was prescribed.  When K.Y. inquired about why he was not receiving his medication, he was informed that if he was on any active medication, it would be brought to him at his door. Despite coming to USP Lee with active prescriptions of Elavil and Remeron, Health Services staff failed to administer his medication while I-Unit was on lockdown.

176.    In an attempt to gain further clarification of his medication discontinuance, K.Y. submitted several electronic requests to Defendant Wasim and other members of Psychology Services.  In his request to discuss treatment options, K.Y. explained that he needed treatment because he was depressed and experiencing suicidal ideations.  K.Y. also mentioned the fears he had about his double-cell assignment, including details about past sexual harassment.

177.    On or around April 13, 2023, I-Unit was lifted from lockdown.  K.Y. proceeded to receive his Elavil and Remeron dosages through the pill line at USP Lee for two days.

44

178. The following day, around lunch time, K.Y. went to the pill line to receive his medication. While at the pill line, Health Services staff informed K.Y. that he was not "allowed" to be on both Elavil and Remeron at the same time, and he would not be receiving either of his medications. Without further explanation, Health Services instructed K.Y. to speak with Psychology Services.

179. On April 18, 2023, having not received a response to his prior requests to Defendant Wasim and Psychology Services, K.Y. decided to try and visit Psychology Services in hopes of receiving an explanation as to why his prescription was canceled. Once in Defendant Wasim's office, Defendant Wasim told K.Y. that there was "no reason" for him to be on his medication. K.Y. was further instructed by Defendant Wasim to "not come in [his] office with [his] problems" as K.Y. was not going to receive any mental health treatment at USP Lee.

180. Doing as he was told, K.Y. began to walk back to the law library. On his way, he encountered the head of the education department, Ms. Mullins, who inquired as to why K.Y. looked so sad. After K.Y. expressed how he was feeling, Ms. Mullins stated that she knew someone that could help, proceeding to contact Defendant Wasim in Psychology Services. While on the phone, Ms. Mullins explained to Defendant Wasim that she had an individual who looked like he was depressed and needed to speak with Psychology Services. She then instructed K.Y. to go and speak with Defendant Wasim despite K.Y. informing her that it was a bad idea.

181. As soon as K.Y. stepped out of the law library to head toward Defendant Wasim's office, he unexpectedly encountered Defendant Wasim, who was waiting for K.Y. in the hallway. Defendant Wasim again told K.Y. that they did not provide mental health treatment at USP Lee. Defendant Wasim was further upset that K.Y. had not come to him with the appropriate "mental health pass" even though he was on the phone with Ms. Mullins minutes earlier. Defendant Wasim

45

then stated that K.Y. did not know who he was "playing with,"  and K.Y. was "going to get what [he was] asking for."  Fearful of what Defendant Wasim may be alluding to, K.Y. agreed to stop asking for mental health treatment from Defendant Wasim and headed back into the law library.

182.    When K.Y. encountered Ms. Mullins, who was in ear shot of his conversation with Defendant Wasim, he reiterated that any further conversation with Defendant Wasim was a bad idea, and that interaction made things worse.

183.    Once back in the law library, K.Y. decided that the only hope he had of getting mental health treatment was by writing to the outside mental health provider who was mentioned in the USP Lee orientation manual distributed to residents.  He also proceeded to write an electronic request to the BOP Prison Rape Elimination Act ("PREA") coordinator and a similar letter to the PREA office explaining his concerns about being in a double-cell.  K.Y. submitted these requests shortly after drafting them.

184.    On or around April 21, 2023, after spending time in the law library, K.Y. encountered Defendant Wasim in a hallway on his way back to I-Unit.  Because there had been an assault on the compound, all residents were supposed to be pat searched before returning to their unit.  While performing a pat search of K.Y., Defendant Wasim proceeded to aggressively stroke and grab K.Y.'s penis over his clothes.  Once he reached K.Y.'s armpits, Defendant Wasim leaned into K.Y.'s ear and whispered, "I'm going to get you fucked up."

185.    Shortly after this interaction, on April 24, 2023, K.Y. heard his name being called over the institution's loud speakers while returning from commissary.  Upon hearing his name called, K.Y. immediately dropped his items down on his bunk and proceeded to the Lieutenant's office.

46

186.   Once at the Lieutenant's office, K.Y. encountered Ms. Gibson from Psychology Services, Defendant Sloan from Psychology Services,[43] Defendant Bailey, Defendant Bullock, Defendant Wasim, and a group of approximately ten correctional officers, two of whom he recognized to be Lieutenants.   The only correctional officer in the room K.Y. recognized was Defendant Gibson.

187.   Shortly after he arrived, Defendant Bullock and Ms. Gibson exited the Lieutenant's office.  Defendant Bailey, Defendant Wasim, and Defendant Sloan then began to make derogatory remarks to K.Y.   Defendant Bailey instructed K.Y. to sign an unknown document.  Fearful of retaliation if he did not comply with her wishes, K.Y. signed the document.

188.   K.Y. was further questioned by Defendant Wasim as to why he was writing to the outside mental health agency for treatment.  To explain himself, K.Y. stated that since he was not going to receive help from Psychology Services, he figured that the outside agency would be able to provide treatment.  By doing so, K.Y. would not have to further bother Defendant Wasim with his "problems."  Before he could finish explaining himself, Defendant Wasim cut off K.Y. and told him that he "shouldn't file complaints at Lee" and staff were going to "kick his ass and fuck [him] up."

189.   An unknown Lieutenant then proceeded to initiate a vote among the staff present in the Lieutenant's office, asking whether staff wanted to "fuck [K.Y.] up or go home."  The unknown Lieutenant, in an attempt to sway the decision, muttered "Sloan, what's up with [K.Y.]? What's up with all these guys around your girl?"[44]  In response, Defendant Sloan stated, "let's get

---

[43] Despite Defendant Sloan's association with Psychology Services, where his title is "Psychology Assistant," K.Y. has seen Defendant Sloan in a similar uniform as other correctional staff at USP Lee.  Defendant Sloan also often engages in use of force exercises and other activities that are not expected of a mental health provider.
[44] Defendant Sloan is allegedly in a relationship with Ms. Gibson from Psychology Services.

47

his ass." In response, an unknown officer stated, "we have about 30 minutes [before shift change] let's get his ass!"

190. K.Y. was then abruptly pulled into a bathroom by Defendant Gibson and Defendant Sloan. Defendant Gibson and Defendant Sloan proceeded to search K.Y. While doing so, Defendant Gibson pulled a phone book containing the contact information for K.Y.'s loved ones out of K,Y.'s pocket and threw it in a nearby trash can. Then, Defendant Sloan pulled a large homemade knife, or "shank", from out from his sock, raised it to K.Y., and further stated, "well, this is what we found on you," threatening to have K.Y. issued an incident report for possessing a dangerous weapon in an attempt to justify the brutal torture K.Y. was about to endure.

191. Following this search, K.Y. was then taken through the R&D x-ray where his body was scanned for an unknown reason. Following the scan, K.Y. was taken to another room where he was again strip searched by a group of staff, including Defendant Sloan. K.Y. was then changed into paper clothing, and instructed to take his glasses off by Defendant Sloan.

192. When K.Y. went to retrieve his glasses off the bench he had laid them on, Defendant Sloan proceeded to punch K.Y. in the face causing him to bleed from his nose. Following the punch, the group of officers began to stomp on K.Y. as he lay on the floor, causing the blood that was pouring out of his nose to pool around his head. The group of staff that were waiting outside the room then flocked into the room and began punching and kicking K.Y. as he lay on the ground in a pool of blood.

193. During this attack, Defendant Sloan pressed his knee on the back of K.Y.'s neck in a manner similar to what was used to murder George Floyd. Officer Jones, a correctional officer who works in R&D, quickly pulled Defendant Sloan off of K.Y. and removed them both from the room. The other officers continued to assault K.Y. for another minute or so.

194. After the assault ceased, K.Y. was then placed into ambulatory restraints and given a helmet to wear on his head. When applying the belly chain, an unknown officer instructed K.Y. to suck his stomach in so the belly chain could be tightened as far as possible. While also applying the wrist and ankle restraints excessively tight upon K.Y., an unknown officer muttered, "we're going to give you the Lee County tattoo." The group of officers then forcefully walked K.Y. out of the room towards the door to the SHU, bending him over at the waist and pushing his head down such that the blood pouring from his nose was not visible to any cameras.

195. Upon arriving in the SHU, K.Y. was put into a holding cell where he would remain in ambulatory restraints for 17 hours. Every 2 hours, staff, including Defendant. Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith, and six other unknown correctional officers proceeded to physically assault K.Y. while he remained in ambulatory restraints. Each time staff entered the cell, K.Y. was instructed to kneel against the back concrete wall. Staff would then enter the cell, ram K.Y. up against the wall with a riot shield and stand on the back of his feet and ankles with their heavy work boots. Staff also repeatedly called K.Y. a "nigger" and exclaim "white power" as they continued to abuse him. K.Y. was not allowed to use the restroom, fed, or given water for the entire period he remained in ambulatory restraints.

196. About an hour after K.Y. was placed in the holding cell, Defendant Bradburn proceeded to enter the cell and ask his colleagues why K.Y. was "here." Looking for a reason, Defendant Bradburn began to inquire, "is he a cho-mo? Some type of sex offender?" In response, an unknown officer stated that K.Y. tried to "holler at Sloan's girl."

197. During this period, approximately three or four times, medical staff, including Defendant Caudill and Defendant Nurse Baker entered the holding cell to perform two-hour

49

restraint checks of K.Y.  Despite blood pouring from his face, open abrasions throughout his body, and other clear signs of distress, the most medical attention K.Y. received on April 24 and 25 was a band aid for one of the open cuts on his body.  After their "medical checks" Defendant Caudill and Defendant Nurse Baker remained in the holding cell as the correctional staff brutally assaulted K.Y.

198.    During the third or fourth restraint check, several unknown officers entered the cell K.Y. was in with an additional ambulatory chain.  The officers ripped off the paper panties K.Y. was given to wear and attempted to tie the chain around K.Y.'s penis, and further hit K.Y. in his penis and testicles with the chain.  One of the unknown officers also forcefully inserted the chain into K.Y.'s anus.  This officer made sexual comments while violating K.Y., such as "oh yeah, you're turning me on."  Neither Defendant Caudill nor  Defendant Nurse Baker were present during the sexual assault.

199.    Following this sexual assault, K.Y. was moved from the bloody cell where he was being beaten to a medical exam room next door.  Once sat in a chair in the medical exam room, an unknown Health Services Defendant entered the room to conduct a recorded "injury report."  K.Y. was instructed by Defendant Lt. Smith that when the camera came on, he was to report that he had "no injuries" or else he would be beaten worse.

200.    To prepare for the recording, Defendant Lt. Smith made K.Y. swallow the blood and mucus that was coming out of his nose from his injuries while the group of officers also present in the cell laughed.  The unknown member of Health Services attempted to clean K.Y. up before the recording commenced to cover up K.Y.'s injuries.  When the recording started, K.Y. complied with the Lieutenant's instructions and shook his head "no" when asked if he had any injuries to

50

report, fearful that noncompliance would be further met by additional violence.  Following this "assessment," K.Y. was moved into another holding cell.

201.    During either the last or the second to last time staff entered the holding cell, K.Y. was subjected to additional emotional torture by USP Lee officers, including Defendant Gilbert. Defendant Gilbert posed a "hypothetical" question to K.Y., asking whether K.Y. would have sexual relations with a "hooker" he already paid $200 to despite later finding out the "hooker" had a penis and not a vagina.

202.    While also in this new holding cell, Defendant Bradburn followed up on his earlier question about why K.Y. was being tortured. Defendant Bradburn stated "we're not doing this to you, psychology had this done to you," explaining that correctional staff had not put out the "hit" to torture K.Y.

203.    At approximately 8:30 a.m. on April 25, 2023, K.Y. was released from the ambulatory restraints by Lt. Mitchell.  K.Y. was then placed in another cell in the SHU, while he was still actively bleeding and in the bloody paper clothing he had been assaulted in.  He was placed in a cell with another resident who had just stabbed on the compound and was also covered in blood from his injuries.

204.    From the assault, K.Y. suffered deep lacerations to his wrists, ankles, and waist from the restraints, abrasions to his genitals and anus, numbness and tingling in his left hand, weekly migraines, back pain, and swelling to his nose and face.  K.Y. also was left with blood in his stool for approximately two weeks after the assault transpired.

205.    Despite several written requests to Health Services staff at USP Lee, K.Y. has not received proper medical care for his injuries sustained on April 24 and 25, 2023.  To this day, K.Y.

51

continues to suffer pain in his left hand, migraines, back pain, and is left with permanent scarring to his wrists, ankles, and waist.

206.   Following the assault, K.Y. was issued a falsified incident report for allegedly assaulting a staff member during the events that transpired between April 24 and 25, 2023.  The DHO hearing, which was attended by Defendant Bradburn, occurred on the Wednesday after the assault, April 26, 2023.  Prior to the hearing, Defendant Bradburn told K.Y. not to say anything or else staff would "do it again," referring to the assault the days prior.

207.   At the hearing, K.Y. requested camera footage of the events from April 24 and 25 but was told he had no right to footage or to bring a witness.   Despite his requests and plea of not guilty, K.Y. was found guilty of this charge, with the DHO report further stating that there was no camera footage of the events.  K.Y. subsequently lost 27 days of good time credit, six months of emails and visitation, and spent 30 days in disciplinary segregation in the SHU.  K.Y. would remain in the SHU for approximately two and a half months.

208.   On or around May 1, 2023, K.Y. was approached by Defendant York who alerted him that he was going to be placed on a different mental health medication, Zoloft, which he was told he was allowed to keep with him in his cell.  During this interaction, K.Y. alerted Defendant York that Zoloft does little to decrease K.Y.'s symptoms, and he would prefer to be placed back on Elavil or Remeron.  Despite his protest, Defendant York told K.Y. to submit requests to staff if the medication was not working.  K.Y. sent multiple different written requests to Defendant York stating that Zoloft was not working for his symptoms, but he has never received a response.

209.   Approximately three months later, K.Y.'s prescription for Zoloft was discontinued. K.Y. did not receive an explanation as to why his medication was discontinued.

210.   To this day, K.Y. continues to suffer from physical symptoms and other manifestations of his diagnosed manic depression.  Such symptoms include depression, paranoia, crying spells, sweating, nightmares, loss of appetite, and anxiety.

211.   As a result of Defendants' failure to provide adequate mental health care, K.Y. has suffered and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and needs.

**D.    Similarly Situated Class Members' Mental Health Issues at USP Lee**

212.   Other similarly situated residents of USP Lee have likewise been denied access to adequate mental health care and treatment, and they have experienced mental and physical injuries as a result.

213.   Class Member R.A. ("R.A.") is a 41-year-old man who has long suffered from a multitude of mental illnesses.  In 2024, R.A. was transferred from USP Lee.  He was told that as a result of an increase in his medical care level and at the request of his unit manager, he was being transferred to a medical center.  As of the filing of this Complaint, R.A. is housed at USP Hazelton.  Approximately three weeks after his arrival at USP Hazelton, R.A. was admitted to the hospital, where he remained for the next 45 days.

214.   On or about 2003–2004, R.A. was diagnosed with intermittent explosive disorder with mixed anxiety and depression and adjustment disorder.

215.   In approximately 2003, R.A. was diagnosed with paranoid schizophrenia.

216.   Prior to his incarceration, R.A. received federal social security disability benefits based on these diagnoses.  As part of this application process, on or about 2017, R.A. was required to meet with a government-sponsored psychiatrist/psychologist, who confirmed R.A.'s diagnoses.

53

217.    At other state and federal institutions, including Newaygo County Jail, Michigan State Prison, Metropolitan Correctional Center (MCC) Chicago, FTC Oklahoma, FCI Greenville, USP McCreary, and USP Atlanta, R.A. has received and taken psychiatric medication to help reduce the symptoms of his mental illnesses.  These medications have included:  Clonzipine, Depakote, Lexapro, Zyprexa, Olanzapine, and BuSpar.  These medications help to reduce symptoms for R.A., such as psychotic episodes, anxiety, and depression.

218.    After arriving at USP Lee in January 2023, R.A. received a 30-day supply of his mental health medication, BuSpar, Depakote, and Olanzapine.  During his intake process at USP Lee, R.A. did not receive a psychological assessment or speak to anyone from Psychology Services.

219.    Several weeks after requesting refills of his medications, Defendant Bullock met with R.A. on or about March 21, 2023.  During that encounter, Defendant Bullock administered a series of psychological tests[45] to R.A., and despite what appears to be a clear conflict in the results of two of the tests, determined that R.A. was not suffering from any of his previously diagnosed mental illnesses, and was instead, malingering.  She replaced his previous diagnoses with one of Other Specified Personality Disorder, Antisocial Personality Traits, and did not renew any of his medications.

220.    Indeed, a short time later, Defendant Wasim, who approved Defendant Bullock's conclusions, told R.A. that the Regional Office would side with him in any grievance appeal, and that R.A. would never get his medication back.

221.    As a result of the abrupt discontinuation of his medication, R.A. endured the following symptoms:  headache, sensitivity to light/sound, difficulty sleeping, anxiety,

---

[45] Upon information and belief, Defendant Bullock did not perform a clinical assessment of R.A., as required by the DSM-V.  Defendant Bullock failed to explain to R.A. how she concluded that he was malingering.

restlessness, worry, irritability, mood swings, difficulty controlling body movements, catatonia, increased perspiration, rapid heartbeat, diarrhea, soreness in ligaments, impaired memory, depression, tension, involuntary muscle movement, twitching, mild muscle aches, and fatigue.

222.    When he received the results of Defendant Bullock's testing in April, R.A. asked about additional treatment options in lieu of his medication.  R.A. was told that both group and individual therapy were available to him.  He expressed interest in both but was never  provided with an actual opportunity to engage in either therapy option.  Indeed, in September 2023, when he expressed interest in psychology programing again, he was told that he should wait to begin psychological programming until he recovered from the physical injuries inflicted by USP Lee staff while he was in four-point restraints.  Despite his repeated requests, R.A. never received any psychological programming while at USP Lee.

223.    R.A. was housed in the SHU at USP Lee for more than six months—from the end of August 2023 through his transfer to USP Hazelton in January 2024—without receiving even one required 30-day SHU review.  And this, despite the fact that his medical records require weekly psychological evaluations.

224.    As a result of Defendants' failure to provide adequate mental health care, R.A. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious health conditions and medical needs.

225.     Class Member M.B. ("M.B.") is a 55-year-old man who was formerly incarcerated at USP Lee.  As a child, M.B. endured severe abuse and psychological trauma, including a sexual assault and complexities related to the death of his father in his early adolescence.  These

experiences had a direct and negative effect on M.B.'s overall mental health, such that he began to experience symptoms consistent with depression at only eleven years old.

226.   At thirteen years old, M.B. had his first encounter with the juvenile justice system. While incarcerated, he attempted suicide on five different occasions and was eventually committed to an in-patient psychiatric hospital to provide further treatment for his complex mental health needs when he was 15 years old.  While in treatment, M.B. received therapeutic interventions as well as medication management to help alleviate the symptoms of his mental illnesses.

227.   Following his discharge from in-patient care, M.B. fell out of compliance with his medication, and began using illegal drugs to self-medicate.  While M.B. continued to attend out-patient treatment, his drug use persisted.  M.B. spent time in the juvenile and adult correctional systems in California before entering the Utah Department of Corrections in 1995.

228.   While a resident in the Utah Department of Corrections, M.B. exhibited symptoms consistent with a mental health disorder.  In 1995, M.B. attempted suicide on multiple occasions, including by means of ingesting razor blades and consuming a toxic substance.  Thereafter, in 1996, M.B. was evaluated and diagnosed with manic depression, and began to receive mental health treatment, including both counseling and medication.

229.   In 2004, while in Utah State Prison at Draper, M.B. was evaluated again and diagnosed with bipolar disorder.  In 2007, he received new diagnoses of major depressive disorder and antisocial personality disorder, also at Draper.  As his diagnoses changed, M.B. was prescribed new medication to address his symptoms.  These medications included Prozac, Seroquel, and BuSpar.

230.   In 2009, M.B. began to reside in the first of several facilities run by the BOP.  While a resident in BOP facilities, M.B.'s diagnoses changed slightly to obsessive-compulsive disorder

56

along with major depressive disorder and bipolar disorder.  He also began exhibiting symptoms consistent with PTSD.  M.B. continued receiving treatment for his mental illnesses with various medications, maintaining this course of treatment at USP Florence and subsequent BOP facilities.

231.    Before residing at USP Lee, M.B. consistently received psychological care at other BOP facilities.  M.B. received both medication and therapeutic interventions at USP Florence from 2011 to 2014; USP Victorville from 2014 to 2021; USP Big Sandy from October 2021 until on or about July 2023; and USP Atlanta on or about July 2023.  This care ceased upon M.B.'s arrival at USP Lee, also on or about July 2023.

232.    When M.B. arrived at USP Lee, he had with him a 30-day supply of his prescribed mental health medications, Elavil and Remeron.  He had consistently received and took both of these medications in accordance with BOP regulations at USP Big Sandy.

233.    On arrival at USP Lee, M.B. was not given a psychological intake assessment, but Dr. Capriles-Mercado, a doctor in Psychology Services at USP Lee, and Defendant Bullock acknowledged his prescribed medications.

234.    Defendant Bullock alleged that, on July 20, 2023, she performed a 30-day SHU review with M.B., claiming that M.B. denied any concerns regarding his mental health during this meeting.  This interaction never occurred and has been falsely reported by USP Lee staff in M.B.'s records.

235.    Later that month, after M.B. was sexually assaulted by his cellmate, Defendant York saw M.B. in the medical room in the SHU.  Defendant York took M.B.'s vital signs, callously noted that this was not the first time M.B. had been sexually assaulted, and again acknowledged that M.B. was taking mental health medications.  Defendant York said nothing to M.B. about discontinuing his medications.

57

236.   On July 24, 2023, without any further interaction with Defendant York or any other Health or Psychology Services staff at USP Lee, M.B. was discontinued from his prescriptions for both Elavil and Remeron.  In response to an administrative grievance he filed, M.B. was informed in October 2023 that this decision stemmed from the fact that he had arrived at USP Lee on medication "without supporting DSM criteria."

237.   On August 11, 2023, M.B. was formally diagnosed with PTSD by Dr. Capriles-Mercado, and received a referral to Health Services for medication management.  However, M.B. was never contacted by Health Services staff, and the staff took no actions to place M.B. back on his medications.

238.   Indeed, shortly after this encounter with Dr. Capriles-Mercado, M.B. was seen by Health Services as a result of a fall from his bunk bed.  During that encounter, M.B.'s Elavil prescription was reinstated to address the physical symptoms related to his fall, but Health Services staff never mentioned anything about a referral from Psychology Services for medication related to M.B.'s mental health.

239.   As a result of the abrupt discontinuation from his medications and the total failure by USP Lee staff to provide any mental health care or treatment whatsoever, M.B. suffered physical and emotional injuries.  These injuries have included:  increased fear, worry, panic, anxiety, sweating, trouble sleeping, depression, and suicidal thoughts.

240.   Defendant Wasim alleges that he conducted a second 30-day SHU review interaction with M.B. on August 17, 2023, claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

241.   On September 11, 2023, M.B. was sexually assaulted by his cellmate.

242.     Defendant Wasim alleges that he conducted a third 30-day SHU review interaction with M.B. on September 12, 2023, claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

243.     Defendant Bailey alleges that she conducted a fourth 30-day SHU review interaction with M.B. on October 12, 2023, claiming that M.B. again denied any concerns regarding his mental health.  This interaction never actually occurred.

244.     On October 13, 2023, in response to a series of written requests and administrative grievances filed by M.B., M.B. was taken to the Lieutenant's office in the SHU where he was met by a medical secretary and other correctional staff, including Lieutenant Parsons.  During this interaction, and while the correctional staff was still present, a member of Psychology Services, H. Mullins, discussed M.B.'s request to speak with someone about his mental health.  H. Mullins gave M.B. a "Feelings" program packet.

245.     Defendant Bailey alleges that a fifth 30-day SHU review interaction occurred with M.B. on November 8, 2023, claiming that M.B. denied any concerns regarding his mental health. This interaction never actually occurred.

246.     Defendant Bailey alleges that a sixth 30-day SHU review interaction was conducted with M.B. on December 7, 2023, claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

247.     As a result of Defendants' failure to provide adequate mental health care, M.B. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

59

248.    Class Member G.B. ("G.B.") is a 37-year-old man who is currently incarcerated at USP Lee.  He was transferred to USP Lee from USP Pollock after enduring a vicious physical attack, which included trauma to his head and a potentially torn rotator cuff.

249.    When he arrived at USP Lee, G.B. did not receive a psychological intake examination.  Shortly after his arrival at USP Lee, G.B. began to experience severe anxiety, particularly in the presence of groups of other residents.  This anxiety has caused him chest pain and drastic weight loss.  G.B. has lost more than 30 pounds since September 2023.

250.    G.B.'s anxiety and other concerns led him to submit a written request asking to have an evaluation by Psychology Services.  Since he has been at USP Lee, G.B. has submitted at least ten of the same or similar requests, but he has yet to receive an evaluation by Psychology Services.

251.    Upon information and belief, every Thursday, representatives from each of the correctional management units at USP Lee, including the Warden's office, case management, medical and psychology, walk through each unit in the facility.

252.    On one particular Thursday, November 16, 2023, G.B. had prepared a written request to submit to the representative from Psychology Services during the walk-through.  G.B.'s request, like all of his others, asked that he receive a psychological examination.  When he attempted to present his request, the representative from Psychology Services suggested that G.B. submit a request to participate in "Turning Point," and promised to bring information to G.B. regarding Turning Point during the next week's walk-through.  The individual from Psychology Services did not explain what Turning Point was to G.B.

253.    The following week, the Psychology Services representative did not have any information for G.B. about "Turning Point," but promised that someone would bring the information about Turning Point to G.B. later.

254.    Upon information and belief, during a Thursday walk-through in January or February 2024 following one of G.B.'s written requests, a representative from Psychology Services brought G.B. from his cell to the Lieutenant's office in the SHU. She then gave him information about Turning Point. This representative from Psychology Services told G.B. that she was not a counselor, but offered to talk with G.B. about how he was feeling. G.B. then asked her who she was, and she refused to respond beyond vaguely saying that she worked in "psychology." She would not provide her name, and would not provide a description of her role within Psychology Services.

255.    According to the BOP's Psychology Services Manual, "Turning Point is the primary in-cell self-help resource for inmates in restrictive housing . . . It is not a treatment program, and instead, is a set of adjunctive materials used as a toolkit for intervening with inmates in restrictive housing."[46] Thus, Turning Point is not a vehicle for treating mental health conditions.

256.    G.B. has been in the SHU since his arrival at USP Lee. As of the filing of this Complaint, G.B. has never had a 30-day SHU review, as required by BOP policy.

257.    G.B. submitted multiple administrative grievance forms both at the institutional and regional levels requesting that he receive treatment for his mental health concerns. G.B.'s grievances have been denied, and he has still not received any treatment whatsoever at USP Lee for his mental health.

---

[46] Program Statement 5310.17 at 21–22.

258.    As a result of Defendants' failure to provide adequate mental health care, G.B. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

259.    Class Member J.B. ("J.B.") is a 43-year-old man who was formerly incarcerated at USP Lee.

260.    Since arriving at USP Lee in the spring of 2023, J.B. requested mental health care from Psychology Services to address mental trauma he suffers arising from tragedies within his family, his time in the military, and his history as a drug user.  J.B. submitted multiple requests to see or speak to someone from Psychology Services, all of which were ignored.

261.    As a result of Defendants' failure to provide adequate mental health care, J.B. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and needs.

262.    Class Member D.D. ("D.D.") is a 33-year-old man who is currently incarcerated at USP Lee.  D.D. was previously diagnosed with several mental illnesses, including PTSD, schizoaffective disorder, and anxiety.  Both prior to his incarceration and at other correctional facilities, D.D. has been treated for these disorders with Seroquel, Olanzapine, and/or Hydroxyzine.

263.    D.D. first started taking mental health medication, Olanzapine, in 2018 when he was incarcerated at a state prison in Renville County, Minnesota.  After his release, his probation officer connected him to a community-based psychiatrist who changed D.D.'s Olanzapine

62

prescription to Seroquel. From 2022 to 2023, D.D. was incarcerated at facilities in Linn County and Bremer County, Iowa, and at both facilities he received Olanzapine and Hydroxyzine.

264. When D.D. was transferred to USP Lee in May 2023, he traveled through two BOP facilities, FTC Oklahoma and USP Atlanta. He was allowed to self-carry his Hydroxyzine, and he received Olanzapine through the pill lines at both FTC Oklahoma and USP Atlanta.

265. When he arrived at USP Lee, D.D. was told by an unidentified woman in a white coat that he "can't have that" (referring to his Olanzapine), and that he would not receive any refills of the Hydroxyzine once he finished what remained of his prescription. No further explanation was given to him, and D.D. was never provided a proper examination before this determination was made. As a result of this unplanned and unmonitored discontinuation of his prescribed medications, D.D. has suffered from difficulty sleeping, involuntary body movements, and an upset stomach. Symptoms of his previously diagnosed mental illnesses have returned, and without his medications, D.D. has difficulty controlling his emotions.

266. As of the date of this filing, D.D. has never had a formal psychology intake examination or any substantive interaction with Psychology Services.

267. As a result of Defendants' failure to provide adequate mental health care at USP Lee, D.D. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

268. Class Member R.F. ("R.F.") is a 42-year-old man who is currently located at USP McCreary, and was formerly incarcerated at USP Lee. R.F. has been previously diagnosed and treated with medication for multiples mental illnesses since 1999, including schizophrenia, generalized anxiety disorder, and major depressive disorder. He has received treatment for these

conditions while housed within the Texas Department of Corrections and within the BOP, including FDC Houston and USP Pollock.

269.    While housed at facilities within the Texas Department of Corrections, R.F. was prescribed and received two medications for these conditions, Trazadone and Trileptal.  Trazadone and Trileptal are both medications that are typically used to treat mental illnesses, such as depression, bipolar disorder, and anxiety.  R.F. routinely received his medications through the pill line, and he took both of his medications during the day and at night during his time in the Texas state corrections system.

270.    Once in federal custody, R.F. was told that the BOP does not administer Trazadone and Trileptal, and his medications were replaced with generic versions, Oxcarbazepine and Citalopram, both of which he continued to take day and night while in custody at other BOP facilities.

271.    When R.F. arrived at USP Lee from USP Pollock in September 2021, he was given a 90-day self-carry supply of Oxcarbazepine and a 60-day supply of Citalopram while he waited for his intake psychological assessment.

272.    Approximately six months after arriving at USP Lee, around March 2022, Defendant York discontinued R.F.'s medications.  Shortly thereafter, R.F. spoke to Defendant York in person, and asked why he had taken R.F. off his medications.  Defendant York replied that R.F.'s medications were discontinued because no medications were detected in R.F.'s body as evidenced from a prior blood sample, suggesting that R.F. had not been taking and/or did not need his prescribed medications.  Defendant York directed R.F. to speak with Defendant Bullock further about his medications.  Prior to the discontinuance of his medications, R.F. was neither seen nor

64

evaluated by Psychology Services.  As noted in Paragraph 59 above, discontinuing mental health medication based solely on non-compliance violates BOP policy.

273.    As a result of the discontinuation of his medications, R.F. has experienced increased severity in his symptoms of depression, sadness, and anger.  R.F. also has had increased panic attacks, sweating, and trouble sleeping.

274.    R.F. submitted multiple written requests to Psychology Services asking for his medication and to see a physician.  R.F.'s requests have been ignored.  R.F. has spoken to several USP Lee officers and medical staff, including Defendant Bullock, who told R.F. that his requests to see a psychologist would be submitted, but that several people were ahead of him on the list. R.F. was never given a proper examination by a psychologist during his residence at USP Lee.

275.    While R.F. was in the SHU at USP Lee around September or October 2023, R.F. again spoke with Defendant Bullock about his medications.  Defendant Bullock, seemingly uninterested in R.F.'s concerns, told him that he did not need any medications, and directed R.F. to speak with Defendant York.

276.    Despite repeated written requests seeking psychological care, and multiple direct pleas to Defendant York and Defendant Bullock for assistance, R.F. never received refills of any of his prescribed medications during his remaining time at USP Lee.

277.    Since the discontinuation of R.F.'s prescribed medications, R.F. has experienced increased fear and worry, paranoia, periods of extreme sadness, trouble focusing, loss of appetite, and trouble sleeping.

278.    As a result of Defendants' failure to provide adequate mental health care at USP Lee, R.F. has suffered, and continues to suffer, physical pain and discomfort, and mental

65

anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

279.    Class Member B.K. ("B.K.") is a 39-year-old transgender man who is currently incarcerated at USP Lee.

280.    In middle school, B.K. was sexually assaulted by one of his male teachers, resulting in substantial trauma.  B.K. began to use drugs at a young age.

281.    B.K. resided at a facility in the New Mexico juvenile justice system.  There, B.K. attempted suicide, and was eventually placed in a unit where he received psychological and psychiatric interventions

282.    Throughout his incarceration as a juvenile, B.K. was prescribed several medications, including Seroquel, Ritalin, and Wellbutrin, and received various other treatments to help reduce his presenting symptoms related to his diagnoses of ADD/ADHD, depression, and bipolar disorder.  Following his release, B.K. became non-compliant with his treatment, and resorted back to self-medication through illegal drug use.  B.K.'s use and sale of drugs resulted in several periods of incarceration within the New Mexico Department of Corrections.

283.    In 2010, while in custody at the Dona Ana County Detention Center, B.K. was examined and prescribed treatment by mental health professionals.  However, B.K. engaged in self-medication through illegal drug use, and failed to comply with these professionals' prescribed course of care at this time.

284.    When B.K. was 28 years old, his wife murdered the son they shared, and then committed suicide.  This traumatic event caused B.K. to further engage in heavy drug-use and violence, leading to B.K.'s eventual incarceration within the BOP.

285. While in custody at USP Thomson, B.K. was diagnosed with ADD, ADHD, and depression, and was prescribed Sertraline to help combat his presenting symptoms. When B.K. was transferred to USP Big Sandy, his Sertraline prescription was continued with an increased dosage. B.K. continued to receive Sertraline when he was transferred to USP McCreary, where his dosage was again increased.

286. Sertraline is an SSRI that helps to restore the balance of serotonin in the brain. Sertraline is used to treat certain mood disorders, such as depression, panic attacks, obsessive-compulsive disorder, and PTSD.

287. When B.K. arrived at USP Lee in September 2023, he was instructed by staff to fill out a form with information relating to his medical history. On the form, B.K. indicated that he was previously prescribed Sertraline. B.K. was given a 30-day supply of Sertraline while in transit from USP Atlanta, which he was to keep on his person and take once per day in the morning until he could be seen for an intake psychological assessment.

288. On October 9, 2023, B.K. was brutally assaulted and tortured by USP Lee staff while placed in ambulatory restraints. B.K. suffered severe injuries to his leg, mouth, nose, and groin area. In addition to these physical injuries, B.K. also suffered extreme emotional distress following the assault perpetrated by USP Lee staff; B.K. exhibited symptoms consistent with a diagnosis of PTSD, manifesting in periods of extreme anxiety and depression. Since he was assaulted at USP Lee, whenever B.K. hears the sound of keys jangling, his heart begins to race and he begins to panic.

289. After his 30-day supply of Sertraline ran out, B.K. received his Sertraline via the USP Lee pill line for approximately two weeks. On November 1, 2023, Defendant Bullock informed B.K. that his history of taking prescribed medications for his diagnosed mental health

67

conditions was not documented in his file and, accordingly, she was not continuing his prescription for Sertraline.

290. After finding out his medication was discontinued, B.K. began to submit written requests to Health Services asking to receive his prescribed dosage of Sertraline. To date, despite at least seven written requests, Health Services staff have failed to provide B.K. with his prescribed Sertraline since November 1, 2023.

291. B.K. has also submitted at least eight written requests to Psychology Services seeking treatment for his mental health conditions. To date, B.K. has not received any explanation or assistance with regard to his medication.

292. Following the discontinuation of his Sertraline by USP Lee staff, B.K. has experienced an increase in the severity of his mental health symptoms, including seeing and hearing things that are not there, anxiety, depression, and low energy. B.K. has also experienced physical symptoms consistent with sudden SSRI discontinuance, including: cramps, diarrhea, appetite loss, weight loss, dizziness, nightmares, unusual and vivid dreams, and trouble sleeping.

293. In early March 2023, B.K. had an interaction with Dr. Capriles-Mercado who had brought B.K. booklets on PTSD and anger-management. When B.K. inquired about the status of his medication, which he has been denied for nearly five months, Dr. Capriles-Mercado said that putting him back on his medication would be a "process." As of the filing of this Complaint, B.K. has not had a psychological assessment at USP Lee, and no one on the staff at USP Lee has taken any steps in relation to any "process" to restore B.K.'s receipt of his prescribed medications.

294. As a result of Defendants' failure to provide adequate mental health care, B.K. has suffered and continues to suffer, physical pain and discomfort, and mental anguish and emotional

distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and needs.

295.   Class Member D.V. ("D.V.") is a 26-year-old man who was formerly incarcerated at USP Lee.  As a child, D.V. was diagnosed with generalized anxiety disorder and ADHD.  Prior to his incarceration, D.V. took medications to reduce the presence of his symptoms, including Concerta, Risperdal, Seroquel, and Trazadone.  He has also received both in-patient and out-patient treatment for mental health conditions throughout his life.

296.   In the summer of 2021, prior to his transfer to the BOP, D.V. was incarcerated at the Polk County Jail and Fort Dodge Correctional Facility in Iowa.  At both facilities, D.V. was prescribed Clonidine to help reduce his symptoms related to his anxiety disorder and ADHD.

297.   Clonidine is a non-stimulant medication used to treat individuals suffering from ADHD and anxiety.  Clonidine regulates hormones in the brain associated with stress and anxiety and can also increase attention and focus.

298.   D.V. was transferred from the above-mentioned Iowa state facilities to USP Atlanta, BOP facility, where he also received his prescription for Clonidine daily.  While in transit to USP Lee from USP Atlanta, D.V. was given a hold-over supply of his Clonidine which was placed with him on the transfer bus.

299.   When D.V. arrived at USP Lee on February 15, 2023, he was asked by a Nurse Ashley from Health Services whether he was taking any medication; D.V. responded that he was taking Clonidine.  Nurse Ashley then informed D.V. that the BOP does not carry Clonidine, and that his prescription would be discontinued as a result.  When D.V. inquired whether there was an alternative to the Clonidine, the nurse directed him to submit a written request to see medical staff.

300.    Within three days of his arrival at USP Lee, D.V. submitted a written request to see Health Services to discuss the discontinuation of his medication.  After receiving no response, D.V. heard from other residents that USP Lee does not offer any medication for mental health concerns, and that he should not expect to receive any help from Health Services or Psychology Services staff.

301.    On May 15, 2023, D.V. was assaulted and tortured by USP Lee staff after being placed in ambulatory restraints.  D.V. suffered an injury to his wrist and had a tooth chipped after his head was slammed against the wall by USP Lee officers.  Following this incident, D.V. experienced increased levels of anxiety.

302.    After his release from the ambulatory restraints, D.V. was placed in a cell with an individual who was instructed by USP Lee staff to further assault D.V.  USP Lee staff informed D.V. that the individual he would be housed with had killed two of his former cellmates, further increasing D.V.'s already heightened level of anxiety.

303.    From mid-May 2023 to mid-July 2023, D.V. was assaulted by his cellmate on many occasions, leaving him with five broken ribs.  In addition to the physical trauma to his body, D.V. was emotionally abused by his cellmate to the point where D.V. feared for his life.  From this experience, D.V. suffered extreme emotional distress; he was consistently on edge, worried that each coming day would be his last.  Without his medication to help reduce his anxiety, D.V. suffered intense mental and emotional pain and fatigue.

304.    D.V. has suffered a litany of physical and emotional symptoms at USP Lee as a result of not receiving any treatment for his diagnosed mental health conditions.  His existing symptoms of anxiety astronomically increased while he was incarcerated at USP Lee, and have had a lasting, negative effect on D.V.'s ability to function.  These symptoms have included:

uncontrollable body movements, slowed reactions, confused thoughts, body aches, headaches, irritability, lucid dreams, depression, nausea, stomach aches, dizziness, trouble sleeping, and increased fear and worry.

305.    As a result of Defendants' failure to provide adequate mental health care, D.V. has suffered and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

**E.    USP Lee's Systemic Failure to Provide Adequate Mental Health Care Required by the United States Constitution**

306.    The named Plaintiffs incorporate by reference, as though fully restated herein, the allegations set forth in Paragraphs 1 through 215 above.

307.    The USP Lee staff mantra that they do not provide psychological or mental health care is true.  Residents who were prescribed and received medication for mental health conditions prior to their time at USP Lee, including at other BOP facilities, lose access to those medications when they come to USP Lee.  Neither Health Services nor Psychology Services at USP Lee conducts adequate examinations of residents for mental health conditions, though they routinely "diagnose" patients as no longer requiring medication.  Residents' medical records are routinely falsified by USP Lee staff to create a record that further treatment, including medication for diagnosed mental health conditions, is not required.  Requests by residents to speak with Health Services or Psychology Services are ignored.  Indeed, merely asking to see Health Services or Psychology Services can result in a resident being assaulted and tortured by USP Lee staff in retaliation.  The psychological check-ins with residents housed in the SHU required by BOP policy do not occur.  And administrative grievances pleading for mental health care do not yield any better

71

treatment for USP Lee residents.  In short, USP Lee staff does not provide adequate mental health care to residents at all.

308.    The experiences reflected by and embodied in the named Plaintiffs' respective individual allegations provide only a partial indication of the systemic and pervasive nature of the deficiencies characterizing USP Lee's provision of and/or failure to provide mental health care services to residents.  Given the profile of the residents housed at USP Lee, all high security offenders and many with significant mental health conditions, the critical implications of the systemic deficiencies characterizing the provision of mental health care at USP Lee are both apparent and disturbing.

**F.    Deviations from the Constitutionally Mandated Standard of Mental Health Care**

309.    Residents at USP Lee have repeatedly been subjected to situations where USP Lee staff have failed or refused to invest the time and effort required to acknowledge, examine, diagnose, and treat residents with existing serious mental health and psychological conditions, or symptoms thereof.

310.    Among other failures, and as described by the named Plaintiffs and identified class members, Defendants have:

- Failed or refused to acknowledge, examine, diagnose and treat the serious or potentially serious mental health medical conditions suffered by USP Lee residents in an appropriate and timely manner, in deliberate indifference to serious medical needs;

- Failed or refused to provide the named Plaintiffs and other similarly-situated USP Lee residents with medication to mitigate diagnosed mental health conditions, in deliberate indifference to serious medical

needs; and

- Falsified residents' medical records to justify their failure or refusal to provide mental health care, in deliberate indifference to serious medical needs.

311. Absent immediate corrective action, USP Lee and the Defendants will continue to subject the named Plaintiffs and the members of the class they seek to represent to further undue pain and suffering in deliberate indifference to these residents' serious medical needs.

## **CLASS ACTION ALLEGATIONS**

312. The named Plaintiffs bring this action for themselves individually and on behalf of all others similarly situated, pursuant to the Eighth Amendment of the United States Constitution.

313. The named Plaintiffs seek to represent a class consisting of all individuals who currently reside or will reside in the future at USP Lee, and who have sought, currently seek, or will seek medical care for mental health conditions while residing at USP Lee. They seek certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure in order to represent a class of persons requesting declaratory and injunctive relief to terminate the ongoing course of conduct on the part of Defendants that is depriving the named Plaintiffs and the class members of their constitutional rights to adequate medical care for mental health conditions, and to enjoin the policies and practices adopted and implemented by Defendants that result in the deprivation of those rights.

314. In addition, the named Plaintiffs seek actual and compensatory damages for the injuries they have suffered at USP Lee as a result of Defendants' systemic failure to provide care for their mental health conditions.

315.    As of the filing of this Second Amended Complaint, approximately 155,500 individuals are incarcerated in the BOP, 93% of whom are men.[47]  Approximately 1,400 men are incarcerated at USP Lee.[48]  More than one in five adults in the United States lives with a mental illness.[49]  One in twenty-five adults lives with a serious mental illness, like schizophrenia, bipolar disorder, or major depressive disorder.[50]  Incarcerated individuals have a higher prevalence of chronic mental health conditions than those in the general population.[51]  The proposed class is, accordingly, so numerous that the joinder of all class members is impracticable.

316.    All current and future USP Lee residents comprising the proposed class are equally subject to the actual or potential adverse impacts on their mental and physical health and emotional well-being resulting from the long-standing and on-going pattern and practice of systemic unconstitutional acts and omissions on the part of Defendants as described in this Complaint. Thus, common questions of law and fact exist as to all class members.  Those common questions include, but are not limited to:  (i) whether Defendants systematically provide inadequate mental health care to individuals residing at USP Lee; (ii) whether Defendants' acts and/or omissions in the provision of or failure to provide mental health care at USP Lee reflect deliberate indifference to the serious medical needs of the individuals residing at USP Lee; (iii) whether Defendants' provision of inadequate mental health care on a systemic basis places the residents of USP Lee at an unreasonable risk of suffering new or worsening mental or physical pain, anguish, and

---

[47] *Statistics*, Fed. Bureau of Prisons,
https://www.bop.gov/about/statistics/population_statistics.jsp;#:~:text=155%2C471%20Total%20Federal%20Inmat
es,Last%20Updated%20February%208%2C%202024 (last visited Mar. 23, 2024).
[48] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/ (last visited Mar. 23, 2024).
[49] *About Mental Health*, Ctrs. for Disease Control and Prevention (Apr. 25, 2023),
https://www.cdc.gov/mentalhealth/learn/index.htm#:~:text=More%20than%201%20in%205,a%20seriously%20debi
litating%20mental%20illness.&text=About%201%20in%2025%20U.S.,bipolar%20disorder%2C%20or%20major%
20depression.
[50] *Id.*
[51] *Id.*

emotional distress; and (iv) whether Defendants have violated the rights of the residents at USP Lee to be free from cruel and unusual punishment as prescribed by the Eighth Amendment.

317.    The named Plaintiffs' claims are typical of the claims of the proposed class as a whole.  The named Plaintiffs are individual residents at USP Lee suffering from an array of serious mental health and psychological conditions that are typical of incarcerated populations, in general, and the incarcerated population at USP Lee, in particular.  The named Plaintiffs and the proposed class they seek to represent have suffered direct injuries, and will continue to be directly injured, due to Defendants' unlawful and unconstitutional pattern and practice of providing inadequate mental health care at USP Lee.

318.    The named Plaintiffs will fairly and adequately represent the interests of the proposed class.  They have no interests separate from or in conflict with those of the class as a whole.   The named Plaintiffs are represented by competent legal counsel with substantial experience in complex civil rights litigation matters, including class actions.

319.    Defendants have acted or failed, and/or refused to act, on grounds that apply generally to the proposed class, such that final injunctive and declaratory relief is appropriate with respect to the class as a whole.

## FIRST CLAIM FOR RELIEF

### Class Declaratory and Injunctive Relief Pursuant to the Eighth Amendment
### of the United States Constitution (All Defendants)

320.    The named Plaintiffs incorporate by reference as though fully restated herein, the allegations set forth in Paragraphs 1–319 above.

321.    Defendants' deliberate indifference to the named Plaintiffs' serious mental health and psychological needs causes avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of their health.

75

322.    The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

323.    Defendants' policies, practices, acts, and/or omissions constitute and reflect deliberate indifference to the serious mental health care needs of the individuals who currently reside and will reside at USP Lee, and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

324.    Defendants' policies, practices, acts, and/or omissions have placed or will place the named Plaintiffs and members of the proposed class they seek to represent at an unreasonable risk of suffering new or worsening serious mental health and medical illnesses, injuries, and harm.

325.    As a direct, foreseeable, and proximate cause of Defendants' unconstitutional policies, practices, acts, and/or omissions in regard to the provision of inadequate mental health care at USP Lee, the named Plaintiffs and others similarly situated have suffered, are currently suffering, and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.  No adequate, readily available, and complete remedy at law exists to address Defendants' wrongful conduct as described herein.  The declaratory and injunctive relief sought herein is necessary to prevent both on-going and future injury.

## SECOND CLAIM FOR RELIEF

### Violation of M.L.'s Eighth Amendment Rights – Medical Care
### (Against Defendant Streeval, Defendant Gilley, Defendant Wasim, and Defendant York)

326.    M.L. incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–325 above.

327. The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

328. Defendants who act with deliberate indifference to an objectively serious medical need violate the Eighth Amendment's prohibition on cruel and unusual punishment.

329. M.L. has a long, documented history of mental health conditions that require treatment and medication which constitutes an objectively serious medical need.

330. Defendants Streeval's, Gilley's, Wasim's, and York's deliberate indifference to M.L.'s serious mental health and psychological needs causes avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

331. Defendants' policies, practices, acts, and/or omissions in refusing to provide M.L. mental health care despite a clear history and a demonstrated necessity of a medication-assisted treatment regime, the number of M.L.'s requests to reinstate that regime, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to M.L.'s serious medical needs, and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

332. Defendants' policies, practices, acts, and/or omissions have placed M.L. at an unreasonable risk of suffering new or worsening serious mental health and medical illnesses, injuries, and harm.

333. As a direct, foreseeable and proximate cause of Defendants' unconstitutional policies, practices, acts, and/or omissions regarding the provision of inadequate mental health medical care at USP Lee, M.L. has suffered, is currently suffering, and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.

334.    As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of Defendants Streeval's, Gilley's, Wasim's, and York's egregious, intentional, and reckless conduct in conscious disregard for M.L.'s mental health care, as well as their pattern and practice of repeatedly violating M.L.'s Eighth Amendment rights, M.L. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial but no less than five million dollars.

## THIRD CLAIM FOR RELIEF

**Violation of Plaintiff E.W.'s Eighth Amendment Rights – Medical Care**
**(Against Defendant Streeval, Defendant Gilley,  Defendant Bullock, Defendant Wasim, and Defendant York)**

335.    E.W. incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–334 above.

336.    The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

337.    Defendants who act with deliberate indifference to an objectively serious medical need violate the Eighth Amendment's prohibition on cruel and unusual punishment.

338.    E.W. has a long, documented history of mental health conditions that require treatment and medication which constitutes an objectively serious medical need.

339.    Defendants Streeval's, Gilley's, Bullock's, Wasim's, and York's deliberate indifference to E.W.'s serious mental health and psychological needs causes avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

340.    These Defendants' policies, practices, acts, and/or omissions in refusing to provide E.W. mental health care despite a clear history and a demonstrated necessity of a medication-

assisted treatment regime, the number of E.W's requests to reinstate that regime, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to E.W.'s serious medical needs, and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

341.   These Defendants' policies, practices, acts, and/or omissions have placed E.W. at an unreasonable risk of suffering new or worsening serious mental health and medical illnesses, injuries, and harm.

342.   As a direct, foreseeable, and proximate cause of Defendants' unconstitutional policies, practices, acts, and/or omissions in regard to the provision of inadequate mental health medical care at USP Lee, E.W. has suffered, is currently suffering, and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.

343.   As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of Defendants Streeval's, Gilley's, Bullock's, Wasim's and  York's egregious, intentional, and reckless conduct in conscious disregard for E.W.'s mental health care, as well as their pattern and practice of repeatedly violating E.W.'s Eighth Amendment rights, E.W. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial but no less than five million dollars.

## FOURTH CLAIM FOR RELIEF

**Violation of Plaintiff S.W.'s Eighth Amendment Rights – Medical Care**
**(Against Defendant Streeval, Defendant Gilley, Defendant Bailey, Defendant Nancy Smith, Defendant Wasim, and Defendant York)**

344.   S.W. incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–343 above.

79

345.    Defendants Streeval's, Gilley's, Bailey's, Nancy Smith's, Wasim's and York's deliberate indifference to S.W.'s serious mental health and psychological needs causes avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

346.    The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

347.    These Defendants' policies, practices, acts, and/or omissions in refusing to provide S.W. mental health care despite a clear history and a demonstrated necessity of a medication-assisted treatment regime, the number of S.W's requests to reinstate that regime, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to S.W.'s serious medical needs, and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

348.    These Defendants' policies, practices, acts, and/or omissions have placed S.W. at an unreasonable risk of suffering new or worsening serous mental health and medical illnesses, injuries, and harm.

349.    As a direct, foreseeable, and proximate cause of these Defendants' unconstitutional policies, practices, acts, and/or omissions in regard to the provision of inadequate mental health medical care at USP Lee, S.W. has suffered, is currently suffering, and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.

350.    As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of Defendants Gilley's, Nancy Smith's, Bailey's, Wasim's, and York's egregious, intentional, and reckless conduct in conscious disregard for S.W.'s mental health care, as well as their pattern and practice of repeatedly

violating S.W.'s Eighth Amendment rights, S.W. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial but no less than five million dollars.

### FIFTH CLAIM FOR RELIEF

**Violation of Plaintiff K.Y.'s Eighth Amendment Rights – Medical Care
(Against Defendant Streeval, Defendant Gilley, Defendant Wasim, Defendant Nurse
Baker and Defendant Caudill and an Unknown Health Services Defendant)**

351. K.Y. incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–350 above.

352. Defendants' deliberate indifference to K.Y.'s serious mental health and psychological needs as well as the injuries he suffered as a result of his brutal assault causes avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

353. The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment." This right includes the right of residents in federal prison to receive adequate medical care.

354. Defendants Streeval's, Gilley's and Wasim's policies, practices, acts, and/or omissions in refusing to provide K.Y. mental health care despite a clear history and a demonstrated necessity of a medication-assisted treatment regime, the number of K.Y.'s requests to reinstate that regime, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to K.Y.'s serious medical care needs, and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution. Indeed, Defendant Wasim's and Defendant Sloan's threats to K.Y. to stop submitting requests for mental health care is

81

reflective of Defendant Streeval's, Defendant Gilley's and Defendant Wasim's deliberate indifference to K.Y.'s serious medical needs.

355. Additionally, Defendants Nurse Baker's, Caudill's, and an Unknown Health Services Defendant's failure to provide any medical treatment despite having observed or heard K.Y. being physically assaulted and at minimum, observed injuries resulting therefrom also reflect deliberate indifference to K.Y.'s serious medical care needs, and violate the Cruel and Unusual Punishment Clause of the Eight Amendment of the United States Constitution.

356. These Defendants' policies, practices, acts, and/or omissions have placed K.Y. at an unreasonable risk of suffering new or worsening serious mental health and medical illnesses, injuries, and harm.

357. Moreover, Defendants Nurse Baker and Caudill were present three or four times K.Y. was physically beaten in the SHU. Each time, they purported to conduct restraint checks and heard and watched other Defendants threaten and assault K.Y.

358. It was also obvious to Defendants Nurse Baker and Caudill that K.Y. was being repeatedly assaulted, and that his restraints were too tight. K.Y. was hit and stomped so hard while he was lying on the ground that blood from his nose pooled around his face and head. Regardless of whether Defendants Nurse Baker and Caudill saw that abuse occur, they would have seen K.Y.'s bloody face and head. Moreover, given that K.Y. continues to suffer numbness and tingling in his left hand, Defendant Nurse Baker's and Defendant Caudill's restraint checks certainly would have revealed that K.Y.'s restraints were too tight and necessitated follow-up care. Additionally, K.Y.'s deep lacerations would have been evident as blood soaked through his clothing. Having seen all of this, it would have been clear, both objectively, and to Defendant Nurse Baker and Caudill in

82

particular, that K.Y. required medical attention.  Instead, however, Defendants Nurse Baker and Caudill did nothing.

359.    Additionally, an Unknown Health Services Defendant, in purporting to conduct a recorded "injury report" on K.Y., heard other Defendants order K.Y. to swipe the blood and mucus from his nose and also heard Defendant Lt. Smith instruct K.Y. to report that he had "no injuries" or else he would be beaten worse.   Having seen and heard these things, it would have been clear, both objectively and to an Unknown Health Services Defendant in particular, that K.Y. required medical attention.  An Unknown Health Services Defendant, instead, did nothing.

360.    As noted above, K.Y. suffered severe physical injuries, and worsening mental health symptoms.

361.    As a direct, foreseeable, and proximate cause of Defendants' unconstitutional policies, practices, acts, and/or omissions regarding the provision of inadequate mental health medical care at USP Lee, K.Y. has suffered, is currently suffering, and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.

362.    As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of Defendants Streeval's, Gilley's, Wasim's, Nurse Baker's, Caudill's and an Unknown Health Services Defendant's egregious, intentional, and reckless conduct in conscious disregard for K.Y.'s medical care, as well as their pattern and practice of repeatedly violating K.Y.'s Eighth Amendment rights, K.Y. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial but no less than five million dollars.

83

## SIXTH CLAIM FOR RELIEF

**Violation of Plaintiff K.Y.'s Eighth Amendment Rights – Gratuitous Violence**
**(Against Defendant Wasim, Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith, and Unknown Defendants)**

363. Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–362 above.

364. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

365. As outlined above, on April 24, 2023 and April 25, 2023, K.Y. was physically and sexually assaulted, without justification and for the very purpose of causing harm, by Defendant Wasim, Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and several unknown Defendants pulled a homemade knife on him and threatened to further harm him, placed him in a dangerous chokehold, placed him in ambulatory restraints that were unwarranted and too tight; rammed and slammed a riot shield into his back and his head against the wall while he kneeled against a wall, and stood on the back of his feet and ankles with their work boots, ripped paper underwear from his body, attempted to tie an ambulatory chain around his penis, struck his penis and testicles with the same chain, and then forcefully inserted the chain into his anus all in violation of explicit BOP policies and the Eighth Amendment.

366. As a result of these Defendants' assault, K.Y. sustained severe physical injuries, including, upon information and belief, multiple deep lacerations, abrasions to his genitals and anus, numbness and tingling in his left hand, swelling to his nose and face, migraines, back pain, as well as emotional distress and mental anguish. He had blood in his stool for approximately two weeks following the assault.

367. As a direct, foreseeable, and proximate result of these Defendants' deliberate

84

indifferences to K.Y.'s health and safety in violation of his Eighth Amendment rights on April 24 through April 25, 2023, K.Y. has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, because of these Defendants' egregious, intentional, and reckless conduct in conscious disregard for K.Y.'s safety, as well as their pattern and practice of repeatedly violating K.Y.'s Eighth Amendment rights, K.Y. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

**Violation of Plaintiff K.Y.'s Eighth Amendment Rights – Failure to Protect
(Against Defendant Nurse Baker, Defendant Caudill and an Unknown Health
Services Defendant)**

368.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–367 above.

369.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."  This includes the right to be protected from known and substantial risks of serious harm.

370.    As outlined above, on April 24 and 25, K.Y. was physically and sexually assaulted multiple times, without justification, by Defendant Wasim, Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and several unknown Defendants, while being held in restraints, in violation of explicit BOP policies and the Eighth Amendment.

371.    Defendants Nurse Baker and Caudill did not actively participate in K.Y.'s abuse, but also violated K.Y.'s Eighth Amendment rights by disregarding and failing to protect him from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to K.Y.'s health and

85

safety.

372.    As noted above, after K.Y. was put into a holding cell in the SHU, where he would remain in ambulatory restraints for 17 hours, other Defendants came into the cell and repeatedly physically and sexually assaulted K.Y. every two hours.

373.    Approximately three or four of the times the group entered K.Y.'s cell, Defendants Nurse Baker and Caudill came in with them to  perform a "two-hour restraint check" where they purported to assess the tightness of K.Y.'s restraints and check his blood pressure.   Before Defendants Nurse Baker and Caudill left the cell, other Defendants would begin berating and abusing K.Y.   Instead of intervening, Defendants Nurse Baker and Caudill did nothing.

374.    Following K.Y.'s sexual assault, an Unknown Health Services Defendant conduct a recorded "injury report" on K.Y.  In the Unknown Health Services Defendant's  presence, K.Y. was made to swipe the blood and mucus from his nose and instructed by Defendant Lt. Smith to report that he had "no injuries" or else he would be beaten worse.  In fear of being subjected to more extreme violence, K.Y. complied with these instructions.

375.    As a result of Defendants Nurse Baker's, Caudill's and an Unknown Health Services Defendant's failure to intervene, K.Y. suffered severe physical injuries, including multiple deep lacerations, abrasions to his genitals and anus, numbness and tingling in his left hand, swelling to his nose and face, migraines, back pain, as well as emotional distress and mental anguish.

376.    It would have been clear to any reasonable observer, and was clear to Defendants Nurse Baker, Caudill and the Uknown Health Services Defendant --- especially given the blood on K.Y.'s face, the injuries to his wrists and ankles -- that other Defendants had previously assaulted K.Y. and were all but certainly going to continue to do so.  Despite this, and having

repeatedly heard and watched other Defendants berate and physically assault K.Y. Defendants Nurse Baker, Caudill and the Unknown Health Services Defendant disregarded and failed to protect K.Y. from the risk of known, unnecessary, and gratuitous force, and were deliberately indifferent to his health and safety.

377.    As a direct, foreseeable, and proximate result of the aforementioned Defendants' deliberate indifference to K.Y.'s health and safety, in violation of his Eighth Amendment rights on April 24 and 25, 2023, K.Y. has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the Defendants egregious, intentional, and reckless conduct in deliberate indifference to K.Y.'s safety, as well as their pattern and practice of repeatedly violating K.Y.'s Eighth Amendment rights, K.Y. is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**

**Assault and Battery of M.L. Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
(Against Defendant United States of America)**

378.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraph 1–377 above.

379.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law enforcement officers of the United States.

380.    Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that

creates in that other person's mind a reasonable apprehension of an imminent battery. Battery is an unwanted touching which is neither consented to, excused, nor justified.

381. As outlined above, on or around May 8 and 9, 2023, and February 28, 2024, Defendant Wasim, Defendant Bradburn, Defendant Gilbert, Lieutenant Hamilton, Officer Thomas, an unknown Assistant Warden, Lieutenant Corbin, and Officer Brooks, repeatedly touched or directed the touching of M.L. in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing M.L. significant harm. Beyond mere touching, Defendant Wasim, Defendant Bradburn, Defendant Gilbert, Lieutenant Hamilton, Officer Thomas, an unknown Assistant Warden, Lieutenant Corbin, and Officer Brooks, on several occasions relevant to this Complaint, without provocation or justification, slapped, punched and stomped on M.L., twice placed him in ambulatory restraints that were unwarranted and too tight; strapped him to a restraint chair and choked him with a belt; unnecessarily placed him in 4-point restraints atop a concrete slab, repeatedly rammed a riot shield into and over his body and the back of his knees; slammed him into concrete walls; beat him while he was in 4-point restraints; and applied a second set of unnecessary 4-point restraints to his wrists and ankles that were too tight..

382. At times, the assault and battery against M.L. occurred while he wearing little clothing, causing severe and lasting injuries to his body.

383. These touchings by Defendant Wasim, Defendant Bradburn, Defendant Gilbert, Lieutenant Hamilton, Officer Thomas, an unknown Assistant Warden, Lieutenant Corbin, and Officer Brooks were unsolicited by M.L., unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Furthermore, these officers engaged in acts, including berating and threatening M.L., and using derogatory and racist remarks against him, intending to create a reasonable apprehension of immediate, unwanted touching of M.L.

88

384.     During the tortious conduct by Defendant Wasim, Defendant Bradburn, Defendant Gilbert, Lieutenant Hamilton, Officer Thomas, an unknown Assistant Warden, Lieutenant Corbin, and Officer Brooks against M.L., each of these officers were acting within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

385.     The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, M.L. has suffered severe physical injuries including, abrasions on his wrists and ankles from the restraints, an infection to one of his ankles from the open wound left from the restraints, permanent scars to his wrists and ankles left by the restraints, a black eye, and various bruising all over his body, as well as emotional pain and suffering for which the United States of America is liable.

## NINTH CLAIM FOR RELIEF

**Assault and Battery of E.W. Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
(Against Defendant United States of America)**

386.     Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraph 1–385 above.

387.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law enforcement officers of the United States.

388.     Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery.  Battery is

89

an unwanted touching which is neither consented to, excused, nor justified.

389. As outlined above, on or around June 30, 2023, Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker, Officer Long, Nurse Stuart Scott and other unknown officers repeatedly touched or directed the touching of E.W. in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing E.W. significant harm. Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker, Officer Long, Nurse Stuart Scott and other unknown officers placed him in ambulatory restraints that were unwarranted and too tight; placed a helmet on him and strapped him to a restraint chair, and wheeled him to the SHU without any justification; physically tortured him every two hours while he was in restraints, including repeatedly punching and kicking him; and excessively pushed E.W. into concrete walls with a riot shield, stood on the backs of his feet, and pushed the riot shield into the backs of E.W.'s knees.

390. At times, the assault and battery against E.W. occurred while he was wearing little clothing, causing severe and lasting injuries to his body.

391. These touchings by Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker, Officer Long, Nurse Stuard Scott and other unknown officers were unsolicited by E.W., unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Furthermore, these officers engaged in acts, including berating and threatening E.W., intending to create a reasonable apprehension of immediate, unwanted touching of E.W.

392. During the tortious conduct by Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker, Officer Long, Nurse Stuart Scott and other unknown officers against E.W., each of these officers were acting within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

393.    The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, E.W. has suffered severe physical injuries, including lacerations and scarring to his wrists, ankles and belly and contusions to the back of his knees, as well as emotional pain and suffering for which the United States of America is liable.

## TENTH CLAIM FOR RELIEF

**Assault and Battery of K.Y. Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)**
**(Against Defendant United States of America)**

394.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraph 1–393 above.

395.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law enforcement officers of the United States.

396.    Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery.  Battery is an unwanted touching which is neither consented to, excused, nor justified.

397.    As outlined above, on or around April 24 through April 25, 2023, Defendant Wasim, Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and other unknown correctional officers, repeatedly touched or directed the touching of K.Y. in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing K.Y. significant harm.  Beyond mere touching, Defendant Sloan, Defendant

91

Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and other unknown correctional officers, on several occasions relevant to this Complaint, without provocation or justification,  punched and stomped on K.Y., threatened him with a homemade knife, placed him in a dangerous chokehold, placed him in ambulatory restraints that were unwarranted and too tight; rammed and slammed a riot shield into his back and his head against the wall while he kneeled against a wall, and stood on the back of his feet and ankles with their work boots, ripped paper underwear from his body, attempted to tie an ambulatory chain around his penis, and struck his penis and testicles with the same chain, all in violation of explicit BOP policies and the Eighth Amendment.

398.    At times, the assault and battery against K.Y. occurred while he was wearing little clothing, causing severe and lasting injuries to his body.

399.    These touchings by Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and other unknown correctional officers, and directed by Defendant Wasim, were unsolicited by K.Y., unwanted, and wholly inappropriate.  The touchings were neither consented to, excused, nor justified.  Furthermore, these officers engaged in acts, including berating and threatening K.Y., and using derogatory and racist remarks such as "nigger" and "white power" against him, intending to create a reasonable apprehension of immediate, unwanted touching of K.Y.

400.    During the tortious conduct by Defendant Wasim, Defendant Sloan, Defendant Bradburn, Defendant Gilbert, Defendant Gibson, Defendant Thompson, Defendant Lt. Smith and other unknown correctional officers against K.Y., each of these officers were acting within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

401.     The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, K.Y. has suffered a bloody nose and swelling to his nose and face, various lacerations and contusions to his wrists, ankles and waist, abrasions to his genitals and anus, continued numbness and tingling in his hand, weekly migraines and back pain and permanent scarring to his wrists, ankles and waist, as well as emotional pain and suffering for which the United States of America is liable.

## ELEVENTH CLAIM FOR RELIEF

**Negligence (M.L.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
(Against Defendant United States of America)**

402.     Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–401 above.

403.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

404.     Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

405.     Defendants Streeval, Gilley, Wasim, and York, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate medical care to M.L. given his history of diagnosed mental health disorders was unreasonably dangerous because it placed M.L. at risk of physical, mental and emotional injury.

406.     Defendants Streeval, Gilley, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the

United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to M.L. at USP Lee, including but not limited to the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide M.L. with his prescribed medications; failure to otherwise treat his diagnosed mental health illnesses; falsifying records to justify these failures; ignoring M.L.'s informal and formal requests for treatment; and retaliating against M.L. for continuing to reasonable request adequate health care and treatment.

407. Defendants Streeval, Gilley, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, negligently and/or carelessly failed to provide adequate medical treatment and/or viable plans for access to mental health services at USP Lee for M.L.

408. These Defendants knew or should have known that M.L. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

409. As a direct and proximate result of the negligence and carelessness of these Defendants, M.L. has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these acts or omissions, M.L. has suffered injuries for which he seeks compensatory and actual damages against the United States.

**TWELFTH CLAIM FOR RELIEF**

**Negligence (E.W.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)**
**(Against Defendant United States of America)**

410. Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–409 above.

411. The Federal Tort Claims Act permits private parties to sue the United States of

94

America in a federal court for torts committed by persons acting on behalf of the United States of America.

412.   Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

413.   Defendants Streeval, Gilley, Nurse Baker, Bullock, Wasim, and York in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate medical care to E.W. given his history of diagnosed mental health disorders was unreasonably dangerous because it placed E.W. at risk of physical, mental and emotional injury.

414.   Defendants  Nurse Baker, Bullock, Wasim, and York, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that alerting Captain Bowles, Lieutenant Roberts, Lieutenant Maxey, Officer Baker and other unknown officers of E.W.'s repeated requests for medical care would create an extreme risk that E.W. would endure physical retaliation.

415.   Defendants Streeval, Gilley, Nurse Baker, Bullock, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to E.W. at USP Lee, including but not limited to the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide E.W. with his prescribed medications; failure to otherwise treat his diagnosed mental

95

health illnesses; falsifying records to justify these failures; ignoring E.W.'s informal and formal requests for treatment; and retaliating against E.W. for continuing to reasonable request adequate health care and treatment.

416.   Defendants Gilley, Nurse Baker, Bullock, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, negligently and/or carelessly failed to provide adequate medical treatment and/or viable plans for access to mental health services at USP Lee for E.W.

417.   These Defendants knew or should have known that E.W. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

418.   As a direct and proximate result of the negligence and carelessness of these Defendants, E.W. has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these acts or omissions, E.W. has suffered injuries for which he seeks compensatory and actual damages against the United States.

## THIRTEENTH CLAIM FOR RELIEF

**Negligence (S.W.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)**
**(Against Defendant United States of America)**

419.   Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–418 above.

420.   The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

421.   Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

422.   Defendants Streeval, Gilley, Bailey, Nancy Smith, Wasim, and York, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate medical care to S.W. given his history of diagnosed mental health disorders was unreasonably dangerous because it placed S.W. at risk of physical, mental and emotional injury.

423.   Defendants Streeval, Gilley, Bailey, Nancy Smith, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to S.W. at USP Lee, including but not limited to the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide S.W. with his prescribed medications; failure to otherwise treat his diagnosed mental health illnesses; falsifying records to justify these failures; and ignoring S.W.'s informal and formal requests for treatment.

424.   Defendants Streeval, Gilley, Bailey, Nancy Smith, Wasim, and York, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, negligently and/or carelessly failed to provide adequate medical treatment and/or viable plans for access to mental health services at USP Lee for S.W.

425.   These Defendants knew or should have known that S.W. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

97

426.   As a direct and proximate result of the negligence and carelessness of these Defendants, S.W. has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these acts or omissions, S.W. has suffered injuries for which he seeks compensatory and actual damages against the United States.

**FOURTEENTH CLAIM FOR RELIEF**

**Negligence (K.Y.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
(Against Defendant United States of America)**

427.   Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–426 above.

428.   The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

429.   Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

430.   Defendants Streeval, Gilley and Wasim, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate medical care to K.Y. given his history of diagnosed mental health disorders was unreasonably dangerous because it placed K.Y. at risk of physical, mental and emotional injury.

431.   Defendants Nurse Baker and Caudill, in the exercise of reasonable care, and pursuant to their authority and responsibilities as a medical provider, official, employee, and/or agent of the United States of America, had a duty to know, or should have known, that their failure to intervene to prevent or limit K.Y.'s assault, as well as their failure to provide adequate medical care to K.Y. during and post-assault, put K.Y. at risk of physical, mental and emotional injury.

432.    Defendants Streeval, Gilley, and Wasim, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to K.Y. at USP Lee, including but not limited to the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide K.Y. with his prescribed medications; failure to otherwise treat his diagnosed mental health illnesses; ignoring K.Y.'s informal and formal requests for treatment; and retaliating against K.Y. for continuing to reasonable request adequate health care and treatment.

433.    Defendants Nurse Baker and Caudill, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to K.Y. at USP Lee, including but not limited to the failure to intervene to prevent or limit K.Y.'s assault, or to provide adequate medical care during and following K.Y.'s assault.

434.    These Defendants knew or should have known that K.Y. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

435.    As a direct and proximate result of the negligence and carelessness of these Defendants, K.Y. has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these acts or omissions, K.Y. has suffered injuries for which he seeks compensatory and actual damages against the United States.

## FIFTEENTH CLAIM FOR RELIEF

**Medical Malpractice (M.L.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)**

99

**(Against Defendant United States of America)**

436. Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–435 above.

437. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

438. Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

439. Defendants Wasim and York, in their capacity and pursuant to their authority and responsibilities as medical providers, officials, employee and/or agent of the United States of America, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

440. Defendants Wasim and York breached their duties of care by failing to ensure that M.L. received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his mental health treatment when they failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of his mental health care history, they failed to provide M.L. with his prescribed medications; failed to otherwise treat his diagnosed mental health illnesses; falsified records to justify these failures; ignored M.L.'s informal and formal requests for treatment; and retaliated against M.L. for continuing to reasonable request adequate health care and treatment.

441. As a proximate and causal result of these Defendants failure to provide any medical care. M.L. has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

100

## SIXTEENTH CLAIM FOR RELIEF

### Medical Malpractice (E.W.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
### (Against Defendant United States of America)

442.   Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–441 above.

443.   The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

444.   Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

445.   Defendants  Bullock, Wasim, and York, as well as Nurse Stuart Scott, in their capacity and pursuant to their authority and responsibilities as medical providers, officials, employee and/or agent of the United States of America, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

446.   Defendants , Bullock, Wasim, and York breached their duties of care by failing to ensure that  E.W. received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his mental health treatment when they failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of his mental health care history, they failed to provide E.W. with his prescribed medications; failed to otherwise treat his diagnosed mental health illnesses; falsified records to justify these failures; ignored E.W.'s informal and formal requests for treatment; and retaliated against E.W. for continuing to reasonable request adequate health care and treatment.

101

447.   Nurse Stuart Scott breached his duty of care by failing to ensure that E.W. received from him reasonable care, skill, or knowledge ordinarily used under similar circumstances to perform proper restraint checks, and instead tightened E.W.'s wrist, ankle and belly restraints in a way that caused injury.

448.   As a proximate and causal result of these Defendants failure to provide any medical care. E.W. has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

## SEVENTEENTH CLAIM FOR RELIEF

**Medical Malpractice (S.W.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)**
**(Against Defendant United States of America)**

449.   Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–447 above.

450.   The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

451.   Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

452.   Defendants Bailey, Nancy Smith, Wasim, and York, in their capacity and pursuant to their authority and responsibilities as medical providers, officials, employee and/or agent of the United States of America, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

453.   Defendants Bailey, Nancy Smith, Wasim, and York breached their duties of care by failing to ensure that S.W. received from them reasonable care, skill, or knowledge ordinarily used

102

under similar circumstances incident to his mental health treatment when they failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of his mental health care history, they failed to provide S.W. with his prescribed medications; failed to otherwise treat his diagnosed mental health illnesses; falsified records to justify these failures; and ignored S.W.'s informal and formal requests for treatment.

454.   As a proximate and causal result of these Defendants failure to provide any medical care. S.W.  has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

**EIGHTEENTH CLAIM FOR RELIEF**

**Medical Malpractice (K.Y.) Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)
(Against Defendant United States of America)**

455.  Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–453 above.

456.  The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

457.   Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

458.   Defendants Wasim, Nurse Baker, and Caudill, in their capacity and pursuant to their authority and responsibilities as medical providers, officials, employee and/or agent of the United States of America, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

459.   Defendant Wasim breached his duties of care by failing to ensure that  K.Y. received

103

from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his mental health treatment when he failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of his mental health care history, he failed to provide K.Y. with his prescribed medications; failed to otherwise treat his diagnosed mental health illnesses; ignored K.Y.'s informal and formal requests for treatment; and retaliated against K.Y. for continuing to reasonable request adequate health care and treatment.

460.   Defendants Nurse Baker and Caudill breached their duties by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to K.Y. at USP Lee, including but not limited to the failure to intervene to prevent or limit K.Y.'s assault, or to provide adequate medical care during and following K.Y.'s assault.

461.   As a proximate and causal result of these Defendants failure to provide any medical care. K.Y. has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

## PRAYER FOR RELIEF

**WHEREFORE**, the named Plaintiffs respectfully pray that this Court:

(a) Issue an order certifying this action to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

(b) Approve the undersigned to serve as class counsel pursuant to Federal Rule of Civil Procedure 23(a)(4) and 23(g).

(c) Issue a judgment declaring that Defendants' policies, practices, acts, and/or omissions as described herein are unlawful and violate plaintiffs' rights under the Constitution and laws of the United States.

(d) Permanently and preliminary enjoin Defendants, their subordinates, agents,

employees, representatives, and all others acting or purporting to act in concert with them or on their behalf from subjecting Plaintiffs and members of the class they seek to represent to the unlawful and unconstitutional treatment described herein, and issue such injunctive orders as are necessary, and/or appropriate to preclude such conduct on an ongoing basis.

(e) Maintain ongoing supervisory jurisdiction of this matter in order to monitor and enforce Defendants' full and continuing compliance with the injunctive relief ordered herein.

(f) Award the named Plaintiffs their reasonable attorneys' fees and litigation costs.

(g) Grant all such other and further relief as this Court may deem necessary and/or appropriate in the interests of justice.

**FURTHERMORE**, Plaintiff M.L. respectfully prays that this Court:

Award him compensatory and punitive damages in an amount to be determined at trial, and totaling at least five million dollars, based on the second, eighth, eleventh, and fifteenth claims for relief asserted herein.

**FURTHERMORE**, Plaintiff E.W. respectfully prays that this Court:

Award him compensatory and punitive damages in an amount to be determined at trial, and totaling at least five million dollars, based on the third, ninth, twelfth, and sixteenth claims for relief asserted herein.

**FURTHERMORE**, Plaintiff S.W. respectfully prays that this Court:

Award him compensatory and punitive damages in an amount to be determined at trial, and totaling at least five million dollars, based on the fourth, thirteenth, and seventeenth claims for relief asserted herein.

**FURTHERMORE**, Plaintiff K.Y. respectfully prays that this Court:

Award him compensatory and punitive damages in an amount to be determined at trial, and totaling at least five million dollars, based on the fifth, sixth, seventh, tenth, fourteenth, and eighteenth claims for relief asserted herein.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims so triable.

Dated:  August 1, 2024                        Respectfully submitted,

                                              [Signatures on following page]

/s/ *W. Hunter Winstead*
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston (*admitted pro hac vice*)
William H. Swain (*admitted pro hac vice*)
Attorneys for Plaintiffs
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, D.C. 20003
Telephone:  (202) 772-2301
WinsteadH@GilbertLegal.com
HuddlestonD@GilbertLegal.com
SwainW@GilbertLegal.com


/s/ *Kristin L. McGough*
Kristin L. McGough (*admitted pro hac vice*)
Attorney for Plaintiffs
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, D.C. 20005
Telephone:  (202) 319-1000
Kristin_McGough@washlaw.org

*Counsel for Plaintiffs*