CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

May 05, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

|  |  |  |
|---|---|---|
| M.L., et al., | ) | |
| Plaintiffs, | ) | Civil Action No. 1:24cv00017 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| PAM BONDI[1] | ) | |
| et al., | ) | By: Hon. Pamela Meade Sargent |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the court on plaintiffs' motion to proceed under pseudonyms, filed contemporaneously with the original Complaint. ("Motion") (Docket Item No. 12.) The court granted plaintiffs' Motion, only insofar as the Complaint and Motion would remain under seal until after the defendants appeared and had a chance to respond to the Motion. Plaintiffs then filed Amended Complaints before defendants had been served. (Docket Item Nos. 24 and 43.) Thereafter, defendants filed Defendants' Response In Opposition To Plaintiffs' Motion To Proceed Under Pseudonyms, ("Defendants' Response") (Docket Item No. 88), to which plaintiffs responded. ("Plaintiffs' Response") (Docket Item No. 91.)

## I.    Background

In this action, plaintiffs sue the United States of America, the Attorney General of the United States, the Director of the Federal Bureau of Prisons, ("BOP"), the Regional Director of the Mid-Atlantic Region of the BOP, and 15 named and 50

---

[1] Pam Bondi, ("Bondi"), became Attorney General of the United States on February 5, 2025. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Bondi should, therefore, be substituted as the lead defendant in this case.

unnamed employees of United States Penitentiary at Lee, ("USP Lee), under the Federal Tort Claims Act and for violations of the Eighth Amendment of the United States Constitution,[2] due to the defendants' alleged denial of adequate medical care and physical and sexual assault of plaintiffs. Plaintiffs M.L., E.W., S.W. and K.Y. represent that they were incarcerated at USP Lee when the allegations in their lawsuit occurred. Plaintiffs request to proceed through use of pseudonyms because the litigation involves sensitive medical information and a fear of retaliation or other unsafe conditions. Defendants oppose the Motion for all named plaintiffs except for K.Y., who alleges sexual assault by defendants. (Defendants' Response at 4.)

Plaintiffs also request anonymity for members of the putative class. However, the court has not yet ruled on plaintiffs' motion for class certification. (Docket Item No. 27.) Until a court certifies a class, a lawsuit is not a class action. *See Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976.) Therefore, at this time, I only will address the named plaintiffs' requests to proceed in this litigation pseudonymously.

As alleged by plaintiffs in the Second Amended Class Action Complaint For Declaratory And Injunctive Relief And For Individual Damages, ("Second Amended Complaint"), (Docket Item No. 43), plaintiff M.L. is a 26-year-old man who was transferred to USP Lee on April 5, 2023. (Second Amended Complaint at 8.) M.L. alleges that he has suffered from severe mental health issues since his first suicide attempt at age seven. (Second Amended Complaint at 8.) Throughout his life, and both in and out of federal custody, M.L. claims to have been diagnosed with schizophrenia, bipolar disorder, major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, post-traumatic stress disorder, ("PTSD"),

---

[2] While the Complaint does not cite it, these claims, if viable, must be pursued under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

intellectual disability, attention-deficit/hyperactivity disorder, borderline personality disorder, antisocial personality disorder, opioid use disorder, cannabis use disorder and phencyclidine use disorder. (Second Amended Complaint at 8.) M.L. claims that he has received mental health treatment and medication for his mental health disorders while both in and out of incarceration for much of his life. (Second Amended Complaint at 8.) Since being incarcerated within the BOP, M.L. claims to have received over 60 Suicide Risk Assessments. (Second Amended Complaint at 8.) M.L. claims that, at prior BOP facilities, he was classified as a Mental Health Care Level 2, and he would receive monthly clinical evaluations from treatment staff. (Second Amended Complaint at 18.)

When he was transferred to USP Lee, M.L. says that he was prescribed Elavil and Lexapro to reduce symptoms of depression, anxiety and mood disorder. (Second Amended Complaint at 19.) M.L. alleges that, shortly after his arrival at USP Lee, Psychology Services abruptly discontinued his medications, falsified documentation stating that M.L. had seen Psychology Services and falsely claims that M.L.'s medications were discontinued due to noncompliance with treatment. (Second Amended Complaint at 20-21.) M.L. claims that, at the time his medications were discontinued, he had never received a meeting or evaluation with Psychology Services, and he had never missed a dose of his medication. (Second Amended Complaint at 22.) M.L. claims that his later review of his Psychology Services records indicated that Psychology and Health Services jointly agreed to discontinue M.L.'s medications based on his friendly demeanor and a purported clinical interview that he asserts never took place. (Second Amended Complaint at 22.) M.L. alleges that Psychology Services also falsely claimed that they had clinically observed M.L., and he claims to have submitted multiple written requests to speak

with Psychology Services about his mental health symptoms that went unanswered. (Second Amended Complaint at 23.)

M.L. claims that, as a result of the abrupt discontinuation of his medication without a proper taper, he experienced physical and mental health symptoms. (Second Amended Complaint at 23.) M.L. then claims that, on May 8, 2023, he submitted a written request to defendant Wasim about the increasing severity of his symptoms and requested treatment and medications, and he was taken to the Lieutenant's office where he met with Wasim. (Second Amended Complaint at 23-24.) M.L. claims that, in response to his written requests, Wasim instructed M.L. to "not fuck with [him]," and shortly thereafter, he was stripped of his clothing and placed into paper clothing and a helmet, and placed into ambulatory restraints on a restraint chair. (Second Amended Complaint at 24.) M.L. claims that he was then wheeled into a holding cell and an unknown assistant warden used the restraint belt to choke M.L. (Second Amended Complaint at 24.) M.L. claims that, he was then walked into a new holding cell, and told to kneel against the back wall while a group of officers, including defendants Hamilton and Bradburn, rammed him into the wall with a riot shield, causing his mouth to bleed. (Second Amended Complaint at 24.) M.L. claims that officers and facility staff, including defendants Wasim, Hamilton and Bradburn, began to punch and kick him. (Second Amended Complaint at 25.) M.L. alleges the assault continued, and every two hours, staff entered his cell to punch, slap and kick him all over his body. (Second Amended Complaint at 25-26.) M.L. alleges that the staff at USP Lee continued to physically and emotionally torture him throughout May 8 and 9, 2023, and that the assaults were carried out in retaliation for his request to receive treatment and medications for his mental health conditions. (Second Amended Complaint at 27-28.) M.L. claims that, as of August 1, 2024, when the Second Amended Complaint was filed, he had not yet received a

clinical evaluation nor had any substantive interaction with Psychology Services staff. (Second Amended Complaint at 28-29.)

Plaintiff E.W. is a 50-year-old man who alleges that he has struggled with mental illness following sexual abuse as a young child. (Second Amended Complaint at 9, 29.) E.W. claims to have begun receiving mental health treatment and medication at six years old and that he has continued to receive treatment for generalized anxiety disorder, major depressive disorder, obsessive-compulsive disorder, attention-deficit disorder and PTSD for over 40 years. (Second Amended Complaint at 29.) Prior to his transfer to USP Lee, and at other BOP facilities, E.W. claims to have been prescribed sertraline, trazodone, Celexa and Remeron. (Second Amended Complaint at 29.) E.W. claims to have been classified as a Mental Health Care Level 2 and to have received monthly clinical consultations from Psychology Services at other BOP facilities prior to his transfer to USP Lee. (Second Amended Complaint at 29.)

E.W. alleges that he arrived at USP Lee on February 8, 2023, with a 10-day supply of Celexa and Remeron, and on his intake form, he indicated that he was experiencing a mental health crisis, required clinical intervention, and he requested to speak with Psychology Services. (Second Amended Complaint at 30.) E.W. claims that, after his 10-day supply of medications ran out, only his refill request for sertraline[3] was renewed, causing him to develop withdrawal symptoms from the abrupt discontinuation of Remeron. (Second Amended Complaint at 30.) E.W. claims that he began to submit written and electronic requests to Psychology and

---

[3] In the Second Amended Complaint, E.W. alleges that he arrived at USP Lee with a 10-day supply of Celexa (citalopram), but later claims that he had a 10-day supply of another SSRI, Zoloft (sertraline). (Second Amended Complaint at 30.)

Health Services, inquiring about the status of his medications, and he was repeatedly told by one program to speak with the other program about his prescriptions. (Second Amended Complaint at 31.) E.W. claims that, on April 4, 2023, Health Services instructed E.W. to contact Psychology Services to discuss his rapid weight loss due to the Health Services provider's concern that it was due to the discontinuation of his psychiatric medication. (Second Amended Complaint at 31.) E.W. began to submit grievances regarding his medications, but claims that he received no responses to his requests from staff at USP Lee, until he was stabbed by his cellmate in May 2023. (Second Amended Complaint at 31-33.)

E.W. alleges that, on the night of May 21, 2023, he was experiencing suicidal thoughts and requested to be isolated for his and his cellmate's safety, and he was eventually removed and placed into a suicide observation cell. (Second Amended Complaint at 32.) E.W. alleges that he was returned to his cell the next day, but he continued to experience symptoms of delusional psychosis, and staff refused to call Psychology Services to provide him with his psychiatric medication. (Second Amended Complaint at 32.) That same day, E.W. claims that he pressed the emergency button in his cell because he was experiencing panic attacks, delusional psychosis and suicidal thoughts, and USP Lee staff member Bates informed E.W. that the only way either he or his cellmate could get help was if there was a physical altercation. (Second Amended Complaint at 32-33.) E.W. claims he was then bitten and stabbed by his cellmate, and while he received treatment for his physical injuries from Health Services, he was once again denied treatment from Psychology Services. (Second Amended Complaint at 33.) E.W. claims that, after the assault, he was issued a false incident report for fighting and remanded to the Segregated Housing Unit, ("SHU"), while awaiting his disciplinary hearing. (Second Amended Complaint at 33.)

After his release from SHU, he again requested treatment from Psychology Services for symptoms that included hearing voices, visual hallucinations, suicidal and homicidal ideations, shortness of breath, sweating, shaking, loss of appetite and insomnia. (Second Amended Complaint at 33.) E.W. claims that, in retaliation for his request, he was taken to the Lieutenant's office, where he was confronted about his requests for Psychology Services by defendant Bullock, who stated that E.W. was not suicidal and did not need mental health treatment. (Second Amended Complaint at 33-34.) E.W. claims that staff then stripped him of his clothing, threw away an administrative grievance found in his pocket, dressed him in a paper suit, placed him into ambulatory restraints and a restraint chair and returned him to the SHU, where he was "physically and emotionally tortured" for 12 hours in retaliation for requesting mental health treatment. (Second Amended Complaint at 34.) Specifically, E.W. claims that the restraints on his wrists, ankles and abdomen were intentionally overtightened by facility staff, resulting in pain, swelling, bruising, cuts and permanent scarring. (Second Amended Complaint at 34-36.) E.W. also claims that, when staff entered his cell for two-hour restraint checks, facility staff would pin him up against the wall with a riot shield, step on the back of his feet and dig the shield into the back of his knees. (Second Amended Complaint at 36.)

Plaintiff S.W. is a 44-year-old man who alleges that he has struggled with anxiety, depression and panic attacks since he first attempted suicide in 2022, while in federal custody. (Second Amended Complaint at 9, 37.)  S.W. alleges that, following his suicide attempt, he received a diagnosis of anxiety disorder and was subsequently prescribed Remeron. (Second Amended Complaint at 37.) S.W. claims that he also was prescribed oxcarbazepine or duloxetine for pain and as a mood stabilizer at various BOP facilities. (Second Amended Complaint at 37.) S.W. alleges that, when he was transferred to USP Lee in August 2022, he was permitted

to self-carry his medications, and he continued to take Remeron once a day and oxcarbazepine twice a day. (Second Amended Complaint at 38.) S.W. alleges that, on August 19, 2022, defendant York performed a 14-day chronic care evaluation of S.W., in which he noted that S.W. would be continued on both medications, and S.W. never had another appointment or interaction with York. (Second Amended Complaint at 38.) S.W. claims that, on February 16, 2023, during his six-month follow-up with Health Services, defendant Nancy Smith reported that S.W. felt his medication was helping his symptoms of anxiety, depression and back pain, and she noted that S.W. had been 98 to 99 percent compliant with his medication over the last six months. (Second Amended Complaint at 38.) S.W. claims that, the next day, York discontinued him from oxcarbazepine and Remeron and instead prescribed Elavil to treat his anxiety and back pain. (Second Amended Complaint at 38.) S.W. claims that Elavil did not control his mental health symptoms, and that his sleep became impaired. (Second Amended Complaint at 39.)

S.W. claims that York falsified a record of a clinical encounter in July 2023 that did not take place, which indicated that S.W.'s anxiety disorder was "resolved." (Second Amended Complaint at 39.) S.W. claims that, as a result of this falsified encounter, his Elavil prescription was not renewed, and he took his last dose in September 2023. (Second Amended Complaint at 39.) S.W. alleges that, due to the discontinuation of Elavil, he began to experience increased worry, panic, depression, trouble sleeping, increased heart rate and loss of appetite. (Second Amended Complaint at 39.) S.W. claims that he submitted multiple written requests to Health Services and Psychology Services, but he was not seen by either program. (Second Amended Complaint at 39-40.) S.W. alleges that, on October 4, 2023, he was informed by a nurse that he had been discharged from chronic care. (Second Amended Complaint at 40.) S.W. claims he filed at least two grievances in October

2023, but did not receive treatment or medication. (Second Amended Complaint at 40-41.) S.W. alleges that, as of August 1, 2024, he had not received medical assistance or mental health care treatment, and his prescriptions have not been renewed. (Second Amended Complaint at 41.)

Plaintiff K.Y. is a 40-year-old man who alleges that he has experienced mental health symptoms since his early adolescence, and throughout his life has been diagnosed with schizophrenia, major depressive disorder, manic depression, attention deficit disorder and unspecified mood disorder. (Second Amended Complaint at 9, 41.) K.Y. claims that he was sexually abused as a child and was first incarcerated at the age of 12. (Second Amended Complaint at 41.) K.Y. alleges that he suffered from a gunshot injury at age 13, which caused new mental health symptoms, including anxiety, paranoia, suicidal ideation and audio and visual hallucinations that, ultimately, resulted in over 30 suicide attempts. (Second Amended Complaint at 41-42.) K.Y. claims that, as an adult, he was in the custody of the Alabama Department of Corrections and received mental health medications such as haloperidol, Abilify, Prozac, Lexapro, Elavil and Remeron. (Second Amended Complaint at 42.) K.Y. asserts that, during the periods when he was not incarcerated, he continued to take his medications as prescribed and also admitted himself into psychiatric facilities at least five different times for treatment. (Second Amended Complaint at 42.) K.Y. alleges that his mental health conditions remained severe when he entered into BOP custody in 2021. (Second Amended Complaint at 42.) K.Y. claims that, in BOP custody, he was designated a Mental Health Care Level 1 and was diagnosed with schizophrenia, major depressive disorder and anxiety, and he had monthly encounters with Psychology Services, who prescribed him Remeron. (Second Amended Complaint at 42-43.) K.Y. alleges that, in February 2022, he was transferred to a different BOP facility, where Psychology Services

9

falsely reported that his schizophrenia was "resolved" without a psychological evaluation, and he was prescribed Zoloft in place of Remeron, which did not reduce K.Y.'s depression and hallucinations. (Second Amended Complaint at 43.) K.Y. alleges that, shortly afterwards, he was moved to a different BOP facility, and while taking Zoloft, he attempted suicide. (Second Amended Complaint at 43.) As a result of the suicide attempt, K.Y. alleges that he was prescribed Elavil and Remeron, which controlled his mental health symptoms. (Second Amended Complaint at 43.)

K.Y. claims that he arrived at USP Lee on April 5, 2023, with a temporary supply of Elavil and Remeron. (Second Amended Complaint at 43.) K.Y. alleges that he did not receive Elavil or Remeron until April 13, 2023, when he received it through the pill line for two days. (Second Amended Complaint at 44.) On the third day, K.Y. alleges that he was denied his medication and instructed to speak with Psychology Services. (Second Amended Complaint at 45.) On April 18, 2023, K.Y. alleges that he visited Psychology Services, and Wasim told him that he did not need to be on mental health medication. (Second Amended Complaint at 45.) K.Y. alleges that, on or around April 21, 2023, Wasim grabbed his penis while performing a pat search of K.Y. (Second Amended Complaint at 46.) K.Y. alleges that, on April 24, 2023, he was called into the Lieutenant's office, where he encountered defendants Gibson, Sloan, Bailey, Bullock and Wasim, along with approximately 10 other correctional officers. (Second Amended Complaint at 46-47.) K.Y. claims that he signed an unknown document presented by Bailey out of fear of retaliation if he refused to sign. (Second Amended Complaint at 47.) K.Y. alleges that staff then questioned and verbally harassed him before he was strip searched and falsely accused of having a knife, which K.Y. claims that defendant Sloan pulled out of his own sock. (Second Amended Complaint at 47-48.) K.Y. claims that Sloan then punched him in the face, and the rest of the officers began to punch and kick him.

(Second Amended Complaint at 48.) K.Y. alleges that he was then placed into ambulatory restraints and a helmet, and his restraints were excessively tightened. (Second Amended Complaint at 49.) K.Y. alleges he was then placed into a SHU holding cell, where he would remain in ambulatory restraints for 17 hours, and staff, including defendants Bradburn, Gilbert, Gibson, Thompson and Smith, entered his cell every two hours, during which time they physically assaulted K.Y. while using racial slurs. (Second Amended Complaint at 49.)

K.Y. alleges that medical staff entered his cell three to four times, but they did not provide appropriate medical care to his injuries, and defendants Caudill and Baker watched while staff physically assaulted him. (Second Amended Complaint at 49-50.) K.Y. alleges that, during a restraint check, multiple corrections officers used an ambulatory chain to sexually assault him. (Second Amended Complaint at 50.) K.Y. alleges that he was then moved to a medical examination room, where he was coerced into reporting that he had no injuries. (Second Amended Complaint at 50-51.) K.Y. alleges that he suffered from deep lacerations to his wrists, ankles and waist from the restraints, abrasions to his genitals and anus, numbness and tingling in his left hand, migraines, back pain and swelling to his nose and face. (Second Amended Complaint at 51.) K.Y. alleges that, despite multiple written requests to Health Services, he has not received proper medical care for his injuries. (Second Amended Complaint at 51-52.) K.Y. alleges that, in May 2023, he was prescribed Zoloft for approximately three months, but the medication did not alleviate his symptoms, and staff did not respond to written requests regarding his concerns about the medication. (Second Amended Complaint at 52.) K.Y. alleges that, as of August 1, 2024, he still experienced depression, paranoia, crying spells, sweating, nightmares, loss of appetite and anxiety related to his untreated mental health symptoms. (Second Amended Complaint at 53.)

## II.    Standard of Review

Generally, a complaint must name all parties to the suit. *See* FED. R. CIV. P. 10(a). The naming requirement demonstrates the presumption of judicial openness and its prioritization in American law. *See Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 806-07 (E.D. Va. 2012). However, this principle "operates only as a presumption and not as an absolute, unreviewable license to deny." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). In the Fourth Circuit, there is no affirmative requirement that a plaintiff ask for leave before filing a complaint under pseudonym. *See B.R. v. F.C.S.B.*, 17 F.4th 485, 496 (4th Cir. 2021) (declining to adopt *Nat'l Commodity & Barter Ass'n v. Gibbs*, 866 F.2d 1240, 1245 (10th Cir. 1989)). Instead, when a party seeks to litigate under a pseudonym, the court must "ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party." *Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014). While the defendants do not oppose K.Y.'s request to proceed under pseudonym, there remains a "judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted." *James*, 6 F.3d at 238.

The Fourth Circuit has adopted a nonexhaustive five-factor test that considers whether (1) the request for pseudonymity is merely to "avoid … annoyance and criticism" or "is to preserve privacy in a matter of sensitive and highly personal nature;" (2) identification poses "a risk of retaliatory physical or mental harm to the requesting party" or "innocent non-parties;" (3) the age of the party seeking to use a pseudonym; (4) whether the action is against a governmental or private party; and

(5) the "risk of unfairness to the opposing party" from permitting anonymity. *James,* 6 F.3d at 238; *see Pub. Citizen,* 749 F.3d at 273-74 (applying five-factor test); *Doe v. Sidar,* 93 F.4th 241, 247-48 (4th Cir. 2024) (applying these "five nonexhaustive factors" and reversing district court's grant of motion to remove pseudonym (citation omitted)); *see also Sidar,* 93 F.4th at 250 (Wilkinson, J., concurring) (agreeing with the court's decision "eschew[ing] a categorical approach to case-sensitive questions which cannot be answered categorically"). I will analyze each of these factors in turn.

## III.    Analysis

The first *James* factor directs the court to consider the pseudonymous parties' need to preserve privacy. *See* 6 F.3d at 238. Plaintiffs argue that pseudonymous litigation is appropriate in this case "because of the highly personal and stigmatized issues contained in the medical records and incidents described in the complaint" render the identities of the plaintiffs and putative class members highly sensitive. (Motion at 4.) Defendants argue that pseudonymity is disfavored under this factor because when plaintiffs put their medical conditions at issue in a case "they are not necessarily afforded the same considerations of sensitivity of their medical information." (Defendants' Response at 4.) Defendants further argue that plaintiffs' "mental health histories and diagnoses alone do not warrant anonymity." (Defendants' Response at 6.) Further, defendants cite numerous documents filed on the public docket in other cases that discuss named plaintiffs' medical histories. (Defendants' Response at 6-7.) "[T]he justification" asserted by the party requesting anonymity must not be "merely to avoid the annoyance and criticism that may attend any litigation" and, instead, must be "to preserve privacy in a matter of sensitive and highly personal nature." *James,* 6 F.3d at 238. "Cases involving mental health issues routinely proceed without concealing the identity of the plaintiff." *Roe v. CVS*

*Caremark Corp.,* No. 4:13cv3481, 2014 WL 12608588, at *2 (D. S.C. Sept. 11, 2014). To warrant anonymity, the mental health concern must be particularly exceptional and stigmatizing. *See Smith v. Towson Univ.,* No. CV JRR-22-2998, 2022 WL 18142844, at *2 (D. Md. Nov. 30, 2022), *aff'd,* No. 22-2319, 2023 WL 3053034 (4th Cir. Apr. 24, 2023).

It is hard to imagine a more exceptional or stigmatizing mental health condition than that which causes suicidal ideation, which M.L., E.W. and K.Y. allege they experienced at USP Lee, and for which they requested assistance. (Second Amended Complaint at 23, 30, 44.) However, cases allowing anonymity to protect mental health often involve allegations of sexual misconduct, a factor which applies to K.Y., but none of the other named plaintiffs. *See, e.g., Doe v. The Rector & Visitors of George Mason Univ.,* 179 F. Supp. 3d 583, 593-94 (E.D. Va. 2016). "It is well established in the Fourth Circuit that cases arising from allegations of sexual assault necessarily concern information of a highly sensitive and personal nature for all parties involved in the alleged assault." *Roe v. Tucker,* 2025 WL 41932, at *4 (E.D. Va. Jan. 7, 2025.); *see also Doe v. Doe*, 85 F.4th 206, 211-12 (4th Cir. 2023). The Fourth Circuit has held that pseudonymity was warranted in a case where "the issues … are not merely sensitive – they involve intimate details of Doe's sexual assault and resulting 'psychological trauma.'" *Sidar*, 93 F.4th at 248. In *Sidar*, the court also noted that the far more restrictive "practice of closing courtrooms to members of the public while a victim of sex crimes testifies … has not been uncommon." 93 F.4th at 248 (quoting *Bell v. Jarvis*, 236 F.3d 149, 167 (4th Cir. 2000)). Therefore, I find that this factor weighs strongly in favor of K.Y. proceeding pseudonymously, and in favor of M.L. and E.W. proceeding pseudonymously.

The second *James* factor asks whether denying leave for the requesting party to proceed under a pseudonym would risk exposure to retaliatory physical or mental harm. *See* 6 F.3d at 238. Plaintiffs argue that their public participation in the case may result in retaliation from BOP staff through "physical harm, further denials of care, or otherwise unsafe conditions." (Motion at 6.) Plaintiffs assert that their fear of violent retaliation is well-founded because plaintiffs have "already been met with merciless retribution by staff, forcing them to seek intervention" from the court. (Motion at 6-7.) Plaintiffs note that, since the filing of their Motion, two named plaintiffs have been transferred from USP Lee. (Plaintiffs' Response at 1.) Defendants argue that plaintiffs have not demonstrated how disclosure of their names would increase the possibility of retaliation when the individual defendants already are aware of plaintiffs' identities. (Defendants' Response at 8.) Courts evaluating this factor have placed particular importance on the retaliatory nature of any threatened harm. *See, e.g., Nelson v. Green*, No. 3:06cv70, 2007 WL 984127, at *2 (W.D. Va. Mar. 28, 2007).

Here, Plaintiffs allege a generalized fear of harm and do not allege any particularized, specific threat that they face if they were not permitted to proceed pseudonymously. While the court acknowledges that two named plaintiffs no longer reside at USP Lee, plaintiffs' allegations specifically relate to the incongruent treatment that they received at USP Lee, which they contrast to their treatment at other BOP facilities, and do not raise concerns that their participation in this lawsuit will cause them to be mistreated at other BOP facilities. Therefore, I find that this factor weighs against granting the Motion.

The third *James* factor concerns the ages of the persons whose privacy interests are sought to be protected. *See* 6 F.3d at 238. Plaintiffs acknowledge that

this factor does not apply to this analysis, and correctly state that age alone is not enough to disqualify plaintiffs from proceeding pseudonymously. (Motion at 7.) Plaintiffs are not minors and do not possess the "special vulnerability" of a child. *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981.)  Therefore, I find that this factor weighs against granting the Motion.

The fourth *James* factor concerns whether the action is against a governmental or private party. *See* 6 F.3d at 238. Plaintiffs argue that this factor weighs in favor of proceeding under pseudonym because they have sued the government and "[t]he allegations against the individual capacity defendants result directly from their roles as government employees, and all the conduct at issue occurred while acting in that capacity." (Plaintiffs' Response at 7.) Plaintiffs further argue that, although "the individual defendants are sued here in their personal capacities, the allegations derive from their work as government employees[;]" therefore, "[t]he allegations against the individual capacity defendants result directly from their roles as government employees, and all the conduct at issue occurred while acting in that capacity." (Plaintiffs' Response at 7.) Defendants argue that, because plaintiffs have sued the government and individual defendants, pseudonymity is disfavored. (Defendants' Response at 9.) As plaintiffs note, this court has held that "[w]hen a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing." *Doe v. Alger*, 317 F.R.D. 37, 41 (W.D. Va. 2016) (alteration in original) (quoting *Yacovelli v. Moeser,* No. 1:02cv596, 2004 WL 1144183, at *8 (M.D. N.C. May 20, 2004)). This view is generally, but not exclusively, as defendants noted, supported in the Fourth Circuit and this district. *Compare Doe v. Settle*, 24 F.4th 932, 939 n.5 (4th Cir. 2022) ("a litigant's identity may not be as important in purely legal or facial challenges…."), *and Doe v. Mast*,

745 F. Supp. 3d 399, 412  (W.D. Va. 2024) ("To be sure, when a litigant only sues a governmental party, courts have generally been more likely to allow a plaintiff leave to proceed under a pseudonym."), *and Doe v. Va. Polytechnic Inst. & State Univ.*, 2020 WL 1287960, at *5 (W.D. Va. Mar. 18, 2020) (finding that the fourth *James* factor weighed against granting anonymity when plaintiff's allegations were against "individual defendants in both their official and individual capacities" and "must be read as also challenging the specific actions" of the defendants), *and Doe v. Kuhn*, 2023 WL 4687209, at *3 (W.D. Va. July 21, 2023) (finding that the fourth factor weighed against plaintiff's request to proceed under pseudonym when "the action is against an individual in his capacity as a state actor, not against a faceless government agency."), *with Pub. Citizen*, 749 F.3d at 274 ("[T]he public interest in the underlying litigation is especially compelling given that Company Doe sued a federal agency."), *and Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, 2025 WL 270050, at *3 (W.D. Va. Jan. 22, 2025) ("The fourth *James* factor is neutral as the fact that the defendant here is a governmental entity makes this case an object of potential public interest but also eliminates fairness concerns"), *and Doe v. Pittsylvania County, Virginia.*, 844 F. Supp. 2d 724, 730 (W.D. Va. 20212) ("[T]he simple fact that plaintiff sues a governmental entity does not give the court more reason to grant her request for anonymity.").

In this action, plaintiffs sue the United States of America, the Attorney General of the United States, the Director of the BOP and the Regional Director of the Mid-Atlantic Region of the BOP in their official capacities, as well as 15 named and 50 unnamed defendants in their individual capacities. (Second Amended Complaint at 9-13.) As the Fourth Circuit noted in *Doe v. Doe*, "the more private parties (sued in their individual capacities), the more likely the courts were to find

that the factor weighed against the plaintiff." 85 F.4th at 215. Therefore, I find that this factor weighs against plaintiffs' request.

The final relevant *James* factor considers the degree to which a party's use of a pseudonym prejudices the other parties to the litigation. *See* 6 F.3d at 238. Plaintiffs assert that defendants would not be prejudiced by pseudonymous litigation because "[d]efendants already know [p]laintiffs' and named putative class members' identities, and, if necessary, [p]laintiffs are willing to provide under seal any necessary identifying information that [d]efendants may lack, including a copy of the Complaint with [p]laintiffs' and class members' full names." (Motion at 8.) Defendants agree that they know plaintiffs' identities, but they argue that plaintiffs "fail[] to appreciate the logistical difficulty and confusion that may result if [p]laintiffs proceed with pseudonyms, particularly considering the numerous related law suits raising similar allegations against USP Lee employees brought by the same [p]laintiffs' counsel." (Defendants' Response at 10.) Specifically, defendants argue that "[d]iscovery will involve dozens of depositions of both individual defendants and other BOP employees as witnesses as well as voluminous document discovery[,]" and "[t]he logistical difficulty in managing significant discovery while [plaintiffs] and the purported class proceed under pseudonymity will unfairly burden [d]efendants." (Defendants' Response at 10.)

This court has held that this factor was "significantly mitigated by named [p]laintiffs' willingness to provide names and other discovery to certain [d]efense counsel … so that they could prepare its defense." *Student A v. Liberty Univ., Inc.,* 602 F. Supp. 3d 901, 920 (W.D. Va. 2022.) However, in *Doe v. Doe*, the Fourth Circuit affirmed the district court's finding that concerns over "difficulty and confusion for [Appellee] during discovery" weighed against allowing the Appellant

to proceed by pseudonym, even though Appellant's identity was known. 85 F.4th at 216. Because defendants generally allege discovery difficulties if plaintiffs proceed pseudonymously, I find that this factor weighs slightly against granting plaintiffs' Motion.

Lastly, the court notes that "the right of public access, whether arising under the First Amendment or the common law, 'may be abrogated only in unusual circumstances.'" *Pub. Citizen*, 749 F.3d at 266 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988)). Therefore, "the public's interest in open proceedings must inform a district court's pseudonymity calculus." *Pub. Citizen*, 749 F.3d at 274. I find that K.Y.'s allegations of sexual assault and resulting psychological trauma implicate "privacy or confidentiality concerns of the highest order" that justify the unusual dispensation of permitting him to proceed in this case using a pseudonym. *Sidar*, 93 F.4th at 248. Further, I note that the defendants' lack of opposition to the relief that plaintiffs request supports granting the Motion as to K.Y. However, I do not find that M.L., E.W. and S.W. have alleged "privacy or confidentiality concerns" that are "sufficiently critical" to allow this "rare dispensation." *James,* 6 F.3d at 238.

## IV.    Conclusion

For the foregoing reasons, plaintiffs' Motion is **GRANTED** as to K.Y., and **DENIED** as to M.L., E.W. and S.W.

An appropriate order will be entered.

**ENTERED**:        May 5, 2025.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

19